# EXHIBIT 1

KeyCite Red Flag - Severe Negative Treatment
Unpublished/noncitable

2018 WL 2016792
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.

Court of Appeal,
First District, Division 5, California.

The PEOPLE, Plaintiff and Respondent,
v.
Sean MOORE, Defendant and Appellant.

A151276
|
Filed 5/1/2018

(San Francisco City and County Super. Ct. No. SCN227235)

**Attorneys and Law Firms**

Office of the Attorney General, 455 Golden Gate Avenue—Suite 11000, San Francisco, CA 94102–7004, George Gascon, San Francisco District Attorney, 850 Bryant Street, Suite 322, San Francisco, CA 94103, Allison G. Macbeth, Office of the San Francisco District Attorney, 850 Bryant Street, Room 322, San Francisco, CA 94103–4611, for Plaintiff and Appellant.

First District Appellate Project, 475 Fourteenth Street, Suite 650, Oakland, CA 94612, Jeffrey Gordon Adachi, San Francisco Public Defender, 555 Seventh Street, 2nd Floor, San Francisco, CA 94103, Dorothy Katherine Bischoff, Office of Public Defender, 555 7th Street, San Francisco, CA 94103–4732, for Defendant and Respondent.

**Opinion**

BRUINIERS, J.

**\*1** Sean Moore was charged with felonious assaults on two San Francisco police officers. At the preliminary hearing on these and other charges, the defense argued the arresting officers were not acting "in the performance of [their lawful] duties"—a required element for several charges. The preliminary hearing magistrate ruled that factual disputes about whether Moore assaulted the officers and whether the officers used reasonable force to arrest him for the assaults should be submitted to a jury. Moore was held to answer on most of the charges, and he renewed his arguments before the superior court in a Penal Code section 995 motion.[1] The superior court found insufficient evidence that the officers were lawfully performing their duties when Moore committed the alleged crimes and set aside eight counts. The People appeal. On the factual record before us, we affirm.

## I. BACKGROUND

Moore was charged by felony information with offenses stemming from an incident on January 6, 2017: felony assault on a peace officer with force likely to cause great bodily injury against Officers Colin Patino and Kenneth Cha (§ 245, subd. (c); counts 1, 2); felony battery with serious bodily injury against Patino (§ 243, subd. (d); count 3); felony battery with injury on a peace officer against both officers (§ 243, subd. (c)(2); counts 4, 5); felony threat to an executive officer against both officers (§ 69, subd. (a); counts 6, 7); felony resisting a peace officer causing serious bodily injury against Patino (§ 148.10, subd. (a); count 8); misdemeanor resisting, obstructing or delaying a peace officer against both officers (§ 148, subd. (a)(1); count 9). Moore was also charged with misdemeanor contempt of a court order (§ 166, subd. (a)(4); count 10). It was further alleged that Moore personally inflicted great bodily injury on Patino as to count 1 (§ 12022.7, subd. (a) ) and that Moore had two prior felony assault convictions within the meaning of section 1203, subdivision (e)(4).[2]

The question raised in this appeal is whether sufficient evidence exists to prosecute Moore on counts 1, 2, and 4 through 9, all of which require proof that the targeted peace officer was engaged "in the performance of [his] duties" at the time of the alleged criminal conduct. (§§ 245, subd. (c); 243, subd. (c)(2), 69, subd. (a); see §§ 148.10, subd. (a) ["in the discharge or attempt to discharge any duty of his or her office or employment"], 148, subd. (a)(1) [same].) "[T]he long-standing rule in California ... [is] that although one is not immune from criminal liability for his resistance to an invalid police action, he cannot be convicted of an offense *against a peace officer 'engaged in ... the performance of ... duties'*

unless the *officer* was acting lawfully at the time. [Citations.] The rule flows from the premise that because an officer has no duty to take illegal action, he or she is not engaged in 'duties,' for purposes of an offense defined in such terms, if the officer's conduct is unlawful." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217, 275 Cal.Rptr. 729, 800 P.2d 1159 [applying § 245, subd. (c) ], superseded by statute on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691, 10 Cal.Rptr.3d 536, 85 P.3d 444; *In re Manuel G.* (1997) 16 Cal.4th 805, 817, 66 Cal.Rptr.2d 701, 941 P.2d 880 [applying same operative language in former § 69 where defendant allegedly used threat to deter officer's performance of duties]; *In re Joseph F.* (2000) 85 Cal.App.4th 975, 982, 102 Cal.Rptr.2d 641 [applying same operative language in former §§ 243, 148].)

A. *Preliminary Hearing Evidence*
**\*2** The preliminary hearing magistrate admitted videorecordings from Cha's and Patino's body cameras, videorecordings of interviews of these officers the day after the incident, and testimony of several witnesses.

Christopher Choy testified that he lived next to Moore. In December 2016, he obtained a temporary restraining order prohibiting Moore from harassing him, and a court hearing on the matter was scheduled for January 11, 2017. On January 6, 2017, at approximately 3:45 a.m., Choy's wife woke him and said, "[H]ey, he's hitting the wall again." Choy then heard something hit the wall of his home that was adjacent to Moore's house. The wall had been previously damaged in that location, and Choy surmised that Moore had hit the wall because Moore often came out in the middle of the night. Choy called the police. At about 4:15 a.m., Patino and Cha responded to the call. Patino approached Choy's home and Cha approached Moore's. Choy told Patino that Moore had been hitting the wall of his house, and he gave Patino a copy of the restraining order with a proof of service on Moore. As Patino reviewed the order, he heard a loud voice coming from Moore's home and went to assist Cha. Neither Patino nor Cha gathered more information about the alleged restraining order violation or asked Choy to authorize a citizen's arrest.

  1. *Encounter Prior to Moore's First Exit Through Gate*
Cha climbed a stairway to Moore's front gate and rang the doorbell. The stairway was walled on both sides and ended in a landing that extended to the front door. A floor-to-ceiling metal gate separated the landing area in front of the door from the rest of the landing and stairway. Moore, who Cha estimated was six feet four inches tall and weighed 275 pounds, opened the door and stepped partway onto the landing behind the gate. He appeared to be holding up his pants with his left hand.

Moore made repeated hostile, belligerent and profane comments to Cha insisting he leave the premises. The following was a typical exchange between the men:

"MOORE: What's going on? What the fuck you show up out here at this time of morning about.

"OFFICER: I got a call for service. Are you okay?

"MOORE: I don't give a fuck—I didn't call. You quit showing up at my house and I didn't call you.

"OFFICER: Whoa, whoa, chill out!

"MOORE: Get the fuck off my stair.

"OFFICER: Hey—chill out!

"MOORE: Get the fuck off my stair. I didn't call you.

"OFFICER: I got a call.

"MOORE: I don't give a fuck who called you.

"OFFICER: The hell's your problem.

"MOORE: [ (*loud and angry* ) ] I don't give a fuck who called you. ... I just put my garbage out. Get the fuck off my stair."[3] Patino arrived about a minute into the encounter, and Moore proceeded to insult both officers and demand they leave. At one point, Moore said, "I'm a remove your ass." When the officers asked if he was threatening them, he said "I ain't threatening shit." He continued to insist the officers "get the fuck off my stair" while he remained behind the gate.

Patino had Moore confirm he was the person subject to Choy's restraining order, and the following exchange occurred:

**\*3** "OFFICER: Hey, so were you violating the restraining order today?

"MOORE: Fuck your order. [¶] ... [¶] ... Hell, no. [¶] ... [¶]

"OFFICER: So it says that you must not, uh—

"MOORE: I don't give a fuck what it said—

"OFFICER: You must not harass, intimidate, molest, attack.

"MOORE: You seen me harassing, imitating or fucking with a Choy[?]" After about three minutes of talking to the officers and multiple demands that they leave his stairway, Moore said, "I'm gonna call and remove you," and he walked inside his home. The officers descended the stairs to the sidewalk while discussing the restraining order. In his interview, Patino said he believed by this point he had probable cause to arrest Moore for violating the restraining order.

Moore stepped back onto the landing carrying what appeared to be a phone and stood behind the gate. He insulted the officers again. Cha said, "Why did you call me those slurs?" and ascended the stairs, followed by Patino. Moore said, "You're done," and asked for Patino's badge number, which Patino provided. While apparently dialing his phone, Moore continued to demand the officers get off his stairs and remained behind the gate. Patino attempted to read to Moore from the restraining order. Moore said, "I ain't fucked with your Choy. I put my garbage out. I'm sweeping my fucking stair." Seconds later, Moore loudly yelled, "It's a goddamn court date on the 11th." He banged on the gate while demanding, "Get off my stair," and gestured in a cross-wise fashion with his forearms while saying, "I'm through talking to you, bitch. Get off. Get off my stair." He remained otherwise stationary behind the gate. The officers said they would not leave.

2. *Encounter After Moore's First Exit Through Gate*
Moore then pulled open the gate, stepped through the gateway while remaining on the landing, and waving his right hand while telling the officers to get off his stairs. One of the officers said, "You wanna get sprayed?" and Moore said, "Fuck your spray," while continuing to wave his hand and insist they leave. Cha then sprayed pepper spray in Moore's direction.[4] Moore turned and stood sideways in the gateway with his left foot raised as if kicking. Cha said in his interview that Moore kicked him in the face. The officers partially descended the stairs. Moore bent over to pick up a piece of paper, closed the gate, entered his doorway, then reemerged, holding a paper in his right hand. The officers appeared to be on the sidewalk where Cha made a radio report of the incident.

About a minute and a half after the pepper spraying, Moore could be seen inside the home through a window.[5] Patino ordered him to return the restraining order papers and come outside because he was under arrest. Patino also said he would get Moore medical attention for the effects of the pepper spray. Moore closed the window. As the officers insisted he come out, Moore exited, tossed papers through the gate, and reentered his home. After the officers continued to insist he come out or they would "kick the gate open," Moore again stepped onto the landing, complaining he could not see. Moore then suddenly opened the gate, stepped forward, squatted, clenched his fists, and then said: "Fuck you. [¶] ...[¶] ... Fuck you. ... I'ma kick your ass, punk."

**\*4** Moore bent over to pick something up, which appeared to fall from his hand. He took a step down toward the papers on the stairs. Cha and Patino ordered Moore to get on the ground, but he did not comply. He took a few steps down and reached to pick up something. The officers said in their interviews they thought this was a good opportunity to arrest Moore. Moore retreated up the stairs as the officers advanced toward him. Patino swung his night stick at Moore at least twice and reached for Moore, then fell backward down the stairs. Patino said during his interview that Moore had tried to block the baton and punched him in the face with a fist, breaking Patino's nose.[6] Cha pointed a gun at Moore and fired twice. Moore was shot in the abdomen and the leg.

3. *Parties' Arguments*
The relevant disputed issue at the preliminary hearing was whether Patino and Cha were engaged in the lawful performance of their duties at the time Moore allegedly resisted, threatened, and assaulted the officers. The prosecution argued the officers were lawfully investigating an alleged violation of the restraining order throughout the encounter; they had probable cause to arrest Moore for violating the restraining order from the beginning of the encounter; and they had probable cause to arrest Moore for resisting, obstructing or delaying the officers' performance of their duties (§§ 148, 148.10), making criminal threats (§ 69) or assaulting the officers (§§ 243, 245) based on Moore's conduct during the encounter. The defense argued the officers were not lawfully performing their duties once Moore ordered them to leave his stairway, which was within the curtilage of his home, and they refused to do so even though they lacked an arrest warrant or exigent circumstances to justify a warrantless seizure. The defense also argued

Moore was unlawfully detained once the officers ordered him out of his house, and the use of pepper spray (and inferably Patino's use of the night stick) was an excessive use of force that entitled Moore to use reasonable force in resistance (assuming he actually kicked or punched the officers—actions not clearly shown on the body camera footage).

   4. *Magistrate's Ruling*

The magistrate ruled that the officers were engaged in the lawful performance of their duties during the initial encounter (before the alleged assaultive conduct that preceded use of pepper spray) because they were not inside Moore's home and were simply asking questions to investigate a crime. The officers, however, did not have the right to effect a warrantless arrest of Moore for violating the restraining order and did not have probable cause to arrest Moore for resisting, obstructing or delaying arrest early in the encounter. Regarding the later part of the encounter, the magistrate ruled there was substantial evidence that Cha believed Moore was in the process of assaulting the officers when he first exited the gate, and Cha therefore acted lawfully when he deployed to pepper spray to arrest Moore for assault. However, factual disputes about whether Moore assaulted the officers and whether the officers used reasonable force to arrest Moore for such an assault should be submitted to a jury. Moore was held over on the charges and allegations reflected in the felony information filed thereafter (see fn. 2).

B. *Section 995 Motion*
Moore filed a section 995 motion to set aside counts 1, 2 and 4 through 9 of the information. He again argued the evidence was insufficient to establish that the officers were lawfully performing their duties when the alleged assaultive acts were committed. The superior court granted the motion.

**\*5** The court ruled as a matter of law, based on undisputed evidence of the officers' conduct, that the officers were not lawfully performing their duties after they ignored Moore's repeated demands to leave his stairway, which was either part of Moore's home or its curtilage. At that point, they were trespassing on Moore's property. (See § 602, subd. (m).) Even if the officers initially had the right to be on the stairway to investigate an alleged violation of the restraining order, the investigation was completed by the time they first descended the stairs as Moore had identified himself, acknowledged the restraining order, and said he had not violated it because he had simply taken out his garbage. The officers did not ask Choy to authorize a citizen's arrest. Even if the officers lawfully reascended the stairs, they had no probable cause to arrest Moore at that time. Thus, they had no right to refuse Moore's demands that they leave, order Moore out of his home, or use pepper spray or other force against him. The court disagreed that Moore's comment, "You're done," was a criminal threat in the circumstances, or that Moore criminally assaulted the officers just prior to Cha's deployment of the pepper spray. The prosecution dismissed the remaining counts in order to bring this appeal.

**II. DISCUSSION**

"[S]ection 995 allows a defendant to challenge an information based on the sufficiency of the record made before the magistrate at the preliminary hearing." (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1071–1072, 103 Cal.Rptr.3d 767, 222 P.3d 214; see *People v. Herrera* (2006) 136 Cal.App.4th 1191, 1202, 39 Cal.Rptr.3d 578 [preliminary hearings and § 995 motions provide " ' "a judicial check on the exercise of prosecutorial discretion" ' and help ensure ' "the defendant [is] not ... charged excessively" ' "].) An information "shall be set aside" if the defendant has been "committed without reasonable or probable cause." (§ 995.)

A. *Standard of Review*
Appellate review of a section 995 determination, " 'in effect disregard[s] the ruling of the superior court and directly review[s] the determination of the magistrate holding the defendant to answer.' [Citations.] Insofar as the ... section 995 motion rests on issues of statutory interpretation, our review is de novo. [Citation.] Insofar as it rests on consideration of the evidence adduced, we must draw all reasonable inferences in favor of the information [citations] and decide whether there is probable cause to hold the defendant[ ] to answer, i.e., whether the evidence is such that 'a reasonable person could harbor a strong suspicion of the defendant's guilt' " (*Lexin v. Superior Court, supra,* 47 Cal.4th at p. 1072, 103 Cal.Rptr.3d 767,

222 P.3d 214.) Neither the superior court nor the reviewing court may substitute its judgment for that of the committing magistrate concerning the weight of the evidence or the credibility of the witnesses. (*People v. Block* (1971) 6 Cal.3d 239, 245, 103 Cal.Rptr. 281, 499 P.2d 961.)

Where, as here, the "engaged-in-duty element" is in dispute, material "disputed facts bearing on the issue of legal cause must be submitted to the jury ... since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez, supra,* 51 Cal.3d at p. 1217, 275 Cal.Rptr. 729, 800 P.2d 1159; accord, *People v. Soto* (1969) 276 Cal.App.2d 81, 87, 80 Cal.Rptr. 627 [conflict in evidence "as to whether a peace officer was making an unlawful or lawful arrest when assaulted by a person accused of a felony under section 243 ... must be resolved by the jury"].) However, "the court, not the jury, usually decides whether police action was supported by legal cause" on a given set of facts (*Gonzales,* at p. 1217, 275 Cal.Rptr. 729, 800 P.2d 1159), and where there is no conflict in the evidence about the material facts, the issue presents a pure question of law. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799, 35 Cal.Rptr.2d 418, 883 P.2d 960.)

B. *Encounter Prior to Moore's First Exit Through Gate*
The People argue there is substantial evidence that the officers were engaged in the lawful performance of their duties when they walked up Moore's stairs to question him about the alleged restraining order violation and in continuing that investigation despite Moore's insistence that they leave. Because the officers' and Moore's actions up to the point of Moore's first exit through the gate are well documented and not materially disputed, this issue presents a pure question of law we review independently.

1. *Legal Standards*
*6 "[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' [Citation.] This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. [¶] *We therefore regard the area 'immediately surrounding and associated with the home'—what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.'* "[7] (*Florida v. Jardines* (2013) 569 U.S. 1, 6, 133 S.Ct. 1409, 185 L.Ed.2d 495, italics added.)

Ordinarily, government officials may not physically intrude into a home or its curtilage for a search or seizure without the resident's consent unless they have a warrant or exigent circumstances permit warrantless entry. (*Payton v. New York* (1980) 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639; *Welsh v. Wisconsin* (1984) 466 U.S. 740, 741–742, 104 S.Ct. 2091, 80 L.Ed.2d 732.) The warrant exception for investigative detentions " 'does not apply to in-home searches and seizures,' " and "to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home ... must be supported by *both* probable cause *and* the existence of exigent circumstances." (*People v. Lujano* (2014) 229 Cal.App.4th 175, 182–183, 176 Cal.Rptr.3d 534), final italics added.) While the " 'exigency' exception" derives from the investigatory function, it allows warrantless entry into a home only if police "have both probable cause to believe that a crime has been or is being committed *and* a reasonable belief that their entry is 'necessary to prevent ... the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " (*U.S. v. Struckman* (9th Cir. 2010) 603 F.3d 731, 738, italics added.)

However, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (*Florida v. Jardines, supra,* 569 U.S. at p. 8, 133 S.Ct. 1409.) " '[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, *wait briefly to be received, and then* (*absent invitation to linger longer*) *leave.*" (*Ibid.,* italics added; see *People v. Rivera* (2007) 41 Cal.4th 304, 308, 59 Cal.Rptr.3d 473, 159 P.3d 60 ["[e]ven if acting on an anonymous, uncorroborated tip, police may knock on the door of a residence, speak with the occupant, and request permission to enter and search"].)

2. *Analysis*
We agree that Cha's *initial* approach to Moore's residence

was lawful. Cha exercised the license available to any private citizen to approach the home from the front path (the stairway), knock or ring the doorbell promptly, and wait to be received. The officers' undisputed purpose was to question Moore about the alleged restraining order violation, not to detain or arrest Moore or search his residence. The officers were acting lawfully as long as the encounter was consensual. However, the encounter unquestionably became nonconsensual almost immediately with Moore's repeated and consistent demands that they leave. The People argue Cha and Patino did not need to accept Moore's denials of culpability at face value or accede to his efforts to cut off questioning, and they had the right to continue their investigation until satisfied with its results. We disagree.

**\*7** Cha's and Patino's refusal to leave Moore's home when he repeatedly demanded that they do so, and their insistence on continuing questioning, transformed an attempt at a consensual encounter into an investigatory detention. A factually analogous case from the federal Seventh Circuit aptly illustrates the point. In *United States v. Jerez* (7th Cir. 1997) 108 F.3d 684 (*Jerez* ), officers approached a motel room at about 11:00 p.m. to speak with the occupants despite lacking probable cause or reasonable suspicion they were involved in criminal activity. (*Id.* at pp. 686–687, 693; see *U.S. v. Cormier* (9th Cir. 2000) 220 F.3d 1103, 1108–1109 [Fourth Amendment protections apply to motel room occupants like residents in their homes].) Officers knocked on the motel room door for several minutes and said, "Police. Open up the door. We'd like to talk to you." When they received no response, one officer knocked on the motel room's window while another kept knocking on the door. After about two minutes, the officer knocking on the window saw movement in the room and shone a light into the room. An occupant pulled open the drapes and let them in the room after an officer showed his law enforcement insignia and said, "Sheriff's Department. Can we talk to you? Would you open the door?" (*Jerez*, at p. 687,.) The court held the encounter was not consensual. (*Id.* at pp. 690–692.) "The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop. ... [¶] ... [¶] Simply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer" and " 'convey [ed] a message that compliance with their requests [was] required.' " (*Id.* at p. 692.)[8]

Moore was not obligated to submit to further questioning within his home, and the officers could not arrest Moore for a misdemeanor violation of a restraining order not committed in their presence.[9] (See § 836 [warrantless arrest permissible when officer "has probable cause to believe that the person to be arrested has committed a public offense in his presence"]; *People v. Welsch* (1984) 151 Cal.App.3d 1038, 1042, 199 Cal.Rptr. 87 ["[i]f the officer cannot testify, based on his or her senses, to acts which constitute every material element of the misdemeanor, it cannot be said that the officer has reasonable cause to believe that the misdemeanor was committed *in his presence*"].) Moore's offensive language and defiance of police authority also failed to justify the officers' continued presence in the curtilage of Moore's home or Moore's detention. (See *In re Chase C.* (2015) 243 Cal.App.4th 107, 115, 196 Cal.Rptr.3d 381 [" '[s]peech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results' "].)

C. *Encounter After Moore's First Exit Through Gate*
The People argue that even if Cha's and Patino's refusal to leave violated the Fourth Amendment, their subsequent actions were not automatically rendered unlawful, nor was Moore given immunity to thereafter break the law. (*In re Richard G.* (2009) 173 Cal.App.4th 1252, 1262, 93 Cal.Rptr.3d 506 ["individual's decision to commit a new and distinct crime, even if made during or immediately after an unlawful detention, is an intervening act sufficient to purge the 'taint' of a theoretically illegal detention"].) Specifically, the People argue the officers had probable cause to arrest Moore for his allegedly assaultive behavior after he first stepped out from behind the gate, and therefore lawfully performed their duties thereafter.[10]

**\*8** We first agree with the People—and Moore readily acknowledges—the officers' alleged constitutional violations do not immunize Moore from criminal liability for all subsequent conduct, including his alleged acts of physical violence. If Patino was not engaged in the performance of his law enforcement duties when Moore allegedly punched him, Moore was not immune from prosecution for battery (§ 243, subds. (a), (d) ); he simply cannot be convicted of battery of a peace officer engaged in the performance of his duties (§ 243, subds. (b), (c) ).

We also agree with the People that an officer's unlawful performance of his or her duties at one moment does not dictate that all of the officer's subsequent conduct in the same encounter is likewise unlawful.[11] They correctly observe that "convict[ion] of an offense against a peace officer ' "engaged in ... the performance of ... [his or her] duties" ' " depends on whether "the officer was acting

lawfully *at the time the offense against the officer was committed*." (*In re Manuel G., supra,* 16 Cal.4th at p. 815, 66 Cal.Rptr.2d 701, 941 P.2d 880, italics omitted & added.) *Prior* unlawful conduct by the officer does not prevent a conviction if the officer was lawfully performing his duties at the time of an alleged offense. The People argue that, even if the officers were no longer lawfully investigating the alleged restraining order violation when reascending the stairway following the initial encounter with Moore, the officers were nevertheless lawfully performing their duties when they attempted to apprehend Moore following Moore's alleged assaultive behavior after he first emerged from behind the gate.[12]

But Moore does not challenge the officers' probable cause to arrest him for the aggravated assault. As he correctly notes, the issue before us is not the lawfulness of his arrest, and his guilt or innocence does not depend on the peace officer status of the victims. The question is simply whether the officers could lawfully intrude into the curtilage of the home over Moore's vociferously expressed objection, and in the absence of probable cause, or other justification, *at the time of the entry* to do so. They could not. The officers were therefore not lawfully engaged in the performance of their duties *at the time* the alleged crimes occurred, even if their subsequent actions in effecting the arrest were lawful.

### III. DISPOSITION

The judgment is affirmed.

WE CONCUR:

SIMONS, Acting P. J.

NEEDHAM, J.

**All Citations**

Not Reported in Cal.Rptr.3d, 2018 WL 2016792

### Footnotes

[1] Undesignated statutory references are to the Penal Code.

[2] The preliminary hearing magistrate dismissed two counts of felony criminal threats (§ 422) and special allegations as to count 3 from the original felony complaint. None of these are at issue here.

[3] Cha accused Moore of spitting on him, but the People do not argue that the officers had probable cause to arrest Moore for assault based on the spitting.

[4] Cha said in his interview it was difficult to retreat because the stairway was narrow and the pepper spray was deployed for safety while he retreated.

[5] Cha said during his interview that he could hear Moore "yelling at the top of his lungs inside the house, pacing back and forth, banging on the wall, banging on the window." This conduct is not discernable on the videorecordings.

[6] Patino is seen later in the videos bleeding in the area of his nose and spitting out blood. Other evidence established that he suffered a broken nose.

[7] It is not disputed on appeal that Moore's stairway, which led only to his front door and landing, fell within the curtilage and is part of Moore's home for Fourth Amendment purposes.

[8] *Jerez* arose within the context of a motion to suppress evidence obtained during a search of the motel room and raised the distinct but related issues of whether the officers unreasonably "seized" the defendants, thus vitiating their consent to the search. (*Jerez, supra,* 108 F.3d at pp. 688, 694–695.) Here, we consider whether the officers were engaged in the lawful performance of their duties when Moore committed the alleged criminal acts. *Jerez* is nonetheless relevant and persuasive authority because both inquiries turn on whether the officers violated the Fourth Amendment when entering the defendants' motel room or residence.

**People v. Moore, Not Reported in Cal.Rptr.3d (2018)**

9     The People have not preserved the prosecution's trial court argument that the officers had probable cause to arrest Moore for violating the restraining order. In a footnote in their opening brief, they state, "Arguably, the preliminary hearing presented other disputed issues to be determined by the jury," including the issue of whether the officers could lawfully arrest Moore in his home based on "Choy's implied request for a citizen's arrest." In their reply brief, they fault Moore for not responding to this theory of probable cause. However, poorly developed arguments raised only in a footnote are deemed forfeited. (*Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106, fn. 6, 157 Cal.Rptr.3d 429.) In any event, the People's cited authority for an implied citizen's arrest is distinguishable because there the defendant was arrested on a public street, not in his home. (*People v. Johnson* (1981) 123 Cal.App.3d 495, 498, 176 Cal.Rptr. 684.)

10     At oral argument, the People clarified that, in their view, Moore's conduct after he first stepped out from behind the gate was an *uncharged* assault that gave the officers probable cause to arrest Moore, and so the officers were lawfully performing their duties (in attempting to arrest Moore) when he committed his *subsequent charged* crimes (which included the alleged kicking and punching of the officers).

11     We further agree with the People that Moore's implied provocation theory of unlawfulness ("officers were not in the lawful performance of their duties when they ... bait[ed] Moore to come out of his home and eject them as trespassers ... leading to the alleged assault and resistance") is invalid under *County of Los Angeles v. Mendez* (2017) –––U.S. ––––, (137 S.Ct. 1539, 1543–1544, 198 L.Ed.2d 52).

12     The People reasonably argue that the trial court failed to analyze events that occurred after Moore first emerged from the gate. The court said it was not ruling on whether Cha lawfully deployed pepper spray and did not know whether Moore kicked Cha at that point. The trial court's failure to address the issue, however, is immaterial because our review is de novo. (*People v. Laiwa* (1983) 34 Cal.3d 711, 718, 195 Cal.Rptr. 503, 669 P.2d 1278.)

---

End of Document        © 2019 Thomson Reuters. No claim to original U.S. Government Works.