# EXHIBIT 2

```
 1         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2           IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
 3        BEFORE THE HONORABLE ETHAN P. SCHULMAN, JUDGE PRESIDING
 4                          DEPARTMENT NO. 19
```

CERTIFIED COPY

```
 6  PEOPLE OF THE STATE OF              PRELIMINARY HEARING
 7  CALIFORNIA,                         VOLUME 1
 8              Plaintiff,              NO. 17000423
    VS.                                              ENDORSED
 9                                                    FILED
                                            San Francisco County Superior Court
10  SEAN W. MOORE,
                                                  MAR 1 3 2017
11              Defendant.
                          /                      CLERK OF THE COURT
12                                            BY:    LISA TEVAGA
                                                              Deputy Clerk
13                REPORTER'S TRANSCRIPT OF PROCEEDINGS
14                     TUESDAY, MARCH 7, 2017
15

16                     A P P E A R A N C E S:
17

18       For the People:
         GEORGE GASCÓN - DISTRICT ATTORNEY
19       Maggie Buitrago, Assistant District Attorney
20
21
         For the Defendant:
22       JEFF ADACHI - PUBLIC DEFENDER
         Brian Pearlman, Deputy Public Defender
23
24
25
26
27
28  OFFICIAL REPORTER:    MARIA A. TORREANO, CSR #8600, CRR, RMR, CCRR
```

| | |
|---|---|
| 1 | THE DEFENDANT: Yeah. |
| 2 | THE COURT: All right. So, with that, Ms. Buitrago... |
| 3 | MS. BUITRAGO: At this time the People call Christopher |
| 4 | Choy to the witness stand. If I may step outside to get him. |
| 5 | THE COURT: You may. |
| 6 | MS. BUITRAGO: Also, for purposes of this hearing, the |
| 7 | People are designating Sergeant Kyra Delaney as our |
| 8 | investigating officer. |
| 9 | THE CLERK: Spelling of your name? |
| 10 | THE WITNESS: K-y-r-a, last name D-e-l-a-n-y. |
| 11 | KYRA DELANEY, SFPD, |
| 12 | Called as a witness for the People, having been duly sworn, |
| 13 | testified as follows: |
| 14 | THE WITNESS: Yes, I do. |
| 15 | THE CLERK: When seated, if you can state and spell your |
| 16 | name for the record. |
| 17 | THE WITNESS: Christopher Choy, C-h-r-i-s-t-o-p-h-e-r, |
| 18 | C-h-o-y. |
| 19 | DIRECT EXAMINATION |
| 20 | BY MS. BUITRAGO: |
| 21 | Q.   Good morning. |
| 22 | A.   Good morning. |
| 23 | Q.   Mr. Choy, do you reside at 521 Capital Street? |
| 24 | A.   Capital Avenue. |
| 25 | Q.   Is that here in the City and County of San Francisco? |
| 26 | A.   Yes. |
| 27 | Q.   How long have you lived at this location? |
| 28 | A.   Since 1991, which would be about twenty-five years there. |

```
1    Q.      What was the date of that court date?
2    A.      January 11th, 2017.
3    Q.      Thank you.
4            At this point I'd like to move People's 2 into evidence.
5            THE COURT:  Any objection?
6            MR. PEARLMAN:  No objection.
7            THE COURT:  People's 2 is admitted.
8            May I see it?
9            MS. BUITRAGO:  Of course...
10           (Whereupon, Exhibit Number 2, previously marked for
11   identification, was admitted into evidence.)
12   BY MS. BUITRAGO:
13   Q.      With this order, Mr. Choy, were there any -- certain types
14   of conduct that Mr. Moore was prohibited from doing?
15   A.      Yes.
16           MR. PEARLMAN:  Objection; calls for hearsay.
17           THE COURT:  Calls for a legal conclusion as to the -- as
18   to the order itself.  I have the order before me.
19           MS. BUITRAGO:  Okay.  I will move on.
20   BY MS. BUITRAGO:
21   Q.      Mr. Choy, on January 6th of 2017, at approximately
22   3:51 a.m., did you call the police?
23   A.      Yes, I did.
24   Q.      Why?
25   A.      At 3:45, my wife -- we were sleeping.  And my wife was
26   awakened by...
27           MR. PEARLMAN:  Objection; that calls for hearsay.
28           THE WITNESS:  Well.
```

```
 1              MS. BUITRAGO:  Your Honor, it's going to the effect on the
 2     listener.
 3              THE COURT:  I'll allow.  Complete your answer, sir.
 4              THE WITNESS:  So she heard something.  And she woke me up
 5     and said, "hey, he's hitting the wall again."
 6              MR. PEARLMAN:  Your Honor, again.  I move to object and
 7     strike the answer as to hearsay and lack of foundation, lack of
 8     personal knowledge.
 9              THE COURT:  Well, it certainly calls for hearsay.  The
10     question is whether there's a proper non-hearsay purpose for
11     the testimony.
12              MS. BUITRAGO:  Correct.  And it's going to explain the
13     effect on the listener and his future conduct.
14              THE COURT:  I will allow it for that limited purpose only.
15     BY MS. BUITRAGO:
16     Q.   So you mentioned that your wife woke you up.  Why?
17              MR. PEARLMAN:  Objection; asked and answered.
18              THE COURT:  I do have the answer.  Next question.
19     BY MS. BUITRAGO:
20     Q.   What did you do when you woke up?
21     A.   I woke up.  And then I heard the wall getting hit, too.
22     Q.   Can you describe which wall?
23     A.   The wall that is... our southern wall, the one that... is
24     next to Mr. Moore's stairs.
25     Q.   What did you do after hearing this noise?
26     A.   I said, "well, he hit it twice.  Maybe we better call the
27     cops."
28     Q.   What prompted you to call the police?
```

```
 1              MR. PEARLMAN:  Objection; asked and answered.
 2              THE COURT:  Do you have anything to add, sir, to what
 3     you've already said?  You may answer the question.
 4              THE WITNESS:  I think nothing that -- nothing to add.
 5    BY MS. BUITRAGO:
 6    Q.   Was, to your knowledge, and your understanding of this
 7         restraining order, was banging on the wall one of the types of
 8         conduct that was prohibited?
 9    A.   Yes.
10              MR. PEARLMAN:  Objection; calls for a legal conclusion.
11              THE COURT:  Sustained; the answer is stricken.
12              MS. BUITRAGO:  Your Honor, it goes to the effect on the
13     listener.
14              THE COURT:  The conduct prohibited by the order will be
15     reflected in the order itself.
16              Whether there's sufficient evidence to hold the defendant
17     for violating the order doesn't -- is not determined by
18     somebody's understanding of what it meant; it's determined by
19     what the order itself says.
20              MS. BUITRAGO:  Correct, Your Honor.  However, if a witness
21     believes something and then calls the police based on that, I
22     think it is within the realm of our Evidence Code to allow the
23     witness to say why he called the police.
24              THE COURT:  Well, I've already heard why he called the
25     police; there was banging on the wall.
26              Next question.
27    BY MS. BUITRAGO:
28    Q.   Okay.  Did the police arrive?
```

```
 1   A.      Yes.
 2   Q.      What time did they arrive?
 3   A.      I think about 4:15.
 4           THE COURT:    A.m.; correct?
 5           THE WITNESS:  A.m., a.m.
 6   BY MS. BUITRAGO:
 7   Q.      Do you remember how many officers?
 8   A.      ... Um... I saw one officer, for sure, because he came up
 9     the stairs.
10   Q.      Do you remember the race of that officer?
11   A.      White.
12   Q.      Was he in uniform?
13   A.      Yes.
14   Q.      Could you see whether or not that officer had arrived at
15     your home in a patrol car?
16   A.      No.
17   Q.      Where did this officer contact you?
18   A.      He came up the stairs, up my stairs.
19   Q.      Okay.  Did he enter your home?
20   A.      Hm... no.
21   Q.      What happened when he contacted you; what did you do?
22   A.      I... he said hello;
23           And then I -- the main thing is I wanted to give him a
24     copy of the restraining order and the proof of service.
25   Q.      Did you --
26           THE COURT:  Ms. Buitrago, I've been leafing through this
27     order, People's exhibit 2, and I finally understand the
28     problem; it is missing pages 2 and 4.
```

1          MS. BUITRAGO:  Correct.  And those are going to be
2  introduced later in the ...
3          THE COURT:  And page 2 of 3, as well.  There's no actual
4  order here; there are fragments of an order that apparently was
5  filed on December 20th.
6          MS. BUITRAGO:  That's correct.
7          THE COURT:  All right.  Proceed.
8  BY MS. BUITRAGO:
9  Q.    So did you in fact provide this order to the officer that
10 arrived at your home?
11 A.    Yes.
12         THE COURT:  "This order," meaning People's exhibit 2?
13         MS. BUITRAGO:  No, Your Honor.
14         THE COURT:  Well, given the incomplete and fragmentary
15 order that you've given me, I think you can understand why I
16 asked the question.  So why don't you clarify the record,
17 please.
18 BY MS. BUITRAGO:
19 Q.    Okay.  Mr. Choy, the photo, or the copy, better yet, of
20 the restraining order that was marked as People's 2, is that
21 the exact piece of paper that you gave to the officer on
22 January 6th?
23 A.    I gave him my copy, which had all the pages.
24 Q.    Okay.  And to clarify further, the copy that you've been
25 shown here today is not the copy that you gave; correct?
26 A.    Correct.
27 Q.    Okay.  So what happened after you gave the officer your
28 physical copy of the restraining order?

```
1   A.      He started to look at it, but was interrupted.
2   Q.      What interrupted your interaction with him?
3   A.      He... I suppose we both heard the same commotion, where he
4           said, "oh, I got to go help my partner."
5   Q.      When you say you heard some commotion, can you explain?
6   A.      There was loud talking, or... coming from the other
7           stairs.
8   Q.      Are you familiar with any of the voices?  Were you able to
9           hear who it might be?
10  A.      Yeah, it was... the loud voice was Mr. Moore's.
11  Q.      So the officer that was with you, did he leave your home?
12  A.      Yes, went down the stairs.
13  Q.      If you had to estimate, how long was your interaction with
14          the officer at your house?
15  A.      Maybe half a minute or so.
16  Q.      During that half a minute, were you able to tell the
17          officer about any of the background between you and Mr. Moore?
18  A.      No.
19  Q.      Were you able to tell that officer any detail about what
20          was going on in the situation?
21  A.      I think only that he was hitting my wall.  Not the
22          officer, Mr. Moore.
23  Q.      What happened next?
24          THE COURT:  May I interject something here?
25          You said something earlier, sir, about shared walls.  Can
26  you explain?  Is there literally a parting wall that separates
27  your house from Mr. Moore's, or what exactly is the physical
28  lay-out?
```

| | |
|---|---|
| 1 | THE WITNESS: If I go up my stairs -- yeah, there's -- the |
| 2 | picture shows it. |
| 3 | If I go up my stairs, my own stairs to my own house, to my |
| 4 | right -- to the left is my house. But to the right is the wall |
| 5 | of the next house, because we go up these stairs. |
| 6 | MR. PEARLMAN: And, Your Honor, I also have an objection |
| 7 | to the last answer, because the Court was asking a follow-up |
| 8 | question. That's lack of foundation as to Mr. Moore banging on |
| 9 | the wall. So I'd ask that that part be stricken. |
| 10 | THE COURT: Well, the answer was that... that Mr. Choy |
| 11 | told the officer that Mr. Moore was hitting the wall. The |
| 12 | motion to strike is denied. |
| 13 | MS. BUITRAGO: Your Honor, would the Court like to see |
| 14 | People's 1 again? |
| 15 | THE COURT: I would. |
| 16 | MS. BUITRAGO: May I approach? |
| 17 | THE COURT: Please. |
| 18 | So looking at People's 1, sir, is the -- what appears to |
| 19 | be an entrance stairway in approximately the middle of the |
| 20 | picture... separating the two structures, is that the entrance |
| 21 | to your house? |
| 22 | THE WITNESS: That is the entrance to Mr. Moore's house. |
| 23 | THE COURT: I see. |
| 24 | And then the second stairway that appears further to the |
| 25 | right, and is therefore to the right of your house, that's the |
| 26 | entrance to your house? |
| 27 | THE WITNESS: Correct. |
| 28 | THE COURT: All right. Thank you. |

 1  BY MS. BUITRAGO:
 2  Q.    What happened after the officer that you had been
 3        interacting with, after he left?
 4        MR. PEARLMAN:  Objection; lack of foundation; lack of
 5        personal knowledge.
 6        THE COURT:  You may answer the question, sir, to the
 7        extent that you have personal knowledge of anything that you
 8        saw or heard.
 9        THE WITNESS:  I just heard.  I didn't see anything; I just
10        heard... yelling and... and -- yeah, just voices, mainly is
11        what I heard, initially.
12  BY MS. BUITRAGO:
13  Q.    Okay.  Do you have a window in the front of your home that
14        looks on to Capital Avenue?
15  A.    Yes.
16  Q.    At some point, did you position yourself so that you could
17        see through that window onto the street?
18  A.    Yes.
19  Q.    While you were at the window, could you both see and hear
20        what was happening outside of your home?
21  A.    I could only hear partly.
22        THE COURT:  And is that the window, sir, that appears in
23        People's exhibit 1 on the second story, above what appears to
24        be a garage door?
25        THE WITNESS:  Yes, yes.  It's a large living room window.
26        THE COURT:  Thank you.
27  BY MS. BUITRAGO:
28  Q.    Okay.  So let's start first with what you heard.  What did

1        you hear after the officer left you?
2    A.  I heard yelling by Mr. Moore;
3        And something, not so loud, from the police officers,
4    because they weren't yelling.
5    Q.  Could you hear...
6        MS. BUITRAGO: Your Honor, I'd ask that the audience to
7    maintain their professional decorum in the courtroom.
8        THE COURT: Yeah, ladies and gentlemen, let's... you're
9    certainly entitled to be here, but let's try and keep quiet,
10   please.
11       Thank you.
12   BY MS. BUITRAGO:
13   Q.  Could you hear the officers ordering any commands?
14   A.  Um... the main commands that I remember were that -- well,
15   they said he was under arrest at some point;
16       And that they -- there was something about giving him back
17   the papers;
18       And then there was an order, somewheres, about getting
19   down, lying down, getting down.
20   Q.  Okay. Based on what you heard, could you compare the
21   demeanor of Mr. Moore to the demeanor of the officers?
22       MR. PEARLMAN: Objection; calls for speculation. He can't
23   see them.
24       THE COURT: Demeanor generally refers to appearance, not
25   to sound.
26       I have her testimony that Mr. Moore was yelling and the
27   officers weren't yelling. Is there something else you're
28   trying to elicit?

1        MS. BUITRAGO:  Your Honor, I'd ask for the witness to be
2    allowed to answer the question.  He heard many things during
3    that time.
4        THE COURT:  Rephrase the question.  The objection is
5    sustained.
6    BY MS. BUITRAGO:
7    Q.   Could you characterize the tone of voice used from the
8    officers to the tone of voice used by Mr. Moore?
9        MR. PEARLMAN:  Objection; asked and answered.
10       THE COURT:  Overruled.
11       THE WITNESS:  Well, the main thing is that Mr. Moore was
12   loud, and -- I guess, generally would be called belligerent.
13   And I didn't... so he, basically, dominated the airwaves.
14       MS. BUITRAGO:  I have no further questions for this
15   witness.
16       THE COURT:  Cross-examination?
17       MR. PEARLMAN:  Thank you, Your Honor.
18                       CROSS-EXAMINATION
19   BY MR. PEARLMAN:
20   Q.   Good morning, Mr. Choy.
21   A.   Pardon me?
22   Q.   Now, when Officer Patino came to your house, you handed
23   him the stay-away order; correct?
24   A.   The restraining order.
25   Q.   Restraining order?
26   A.   Restraining order and proof of service.
27   Q.   And you didn't have a chance to talk with him about what
28   happened.  Would that be fair to say?

| | | |
|---|---|---|
| 1 | A. | No, other than to say that he was hitting the wall. |
| 2 | Q. | Oh. And you didn't go through the incident at all with |
| 3 | | him. He didn't ask you any questions about what happened -- |
| 4 | | any follow-up questions? |
| 5 | A. | No, because he didn't have a chance; I would say he had to |
| 6 | | go away. |
| 7 | Q. | Okay. Now, the officer never came back to your house, at |
| 8 | | any time, to follow-up on the -- on the incident that happened, |
| 9 | | on the banging on the wall. Is that fair to say? |
| 10 | A. | Correct; he did not come back to me on that. |
| 11 | Q. | He never asked you to sign a citizen's arrest, did he? |
| 12 | A. | No. |
| 13 | Q. | Now, you never actually saw Mr. Moore hit the wall. Would |
| 14 | | that be fair to say? |
| 15 | A. | Correct. |
| 16 | Q. | And you can't see into the stairwell from your house; you |
| 17 | | could only see into the street? |
| 18 | A. | Correct. |
| 19 | Q. | Now, when the officers were telling Mr. Moore to get down, |
| 20 | | they were yelling, weren't they? |
| 21 | A. | ... Yes -- you know, I mean loud enough where I could hear |
| 22 | | it. |
| 23 | Q. | And there were multiple times that the officers also |
| 24 | | yelled loud enough where you could hear them? |
| 25 | A. | Yes. I had -- I think I mentioned the times that I did |
| 26 | | hear them. |
| 27 | Q. | Okay. And from your distance, and if you can't answer |
| 28 | | this, tell me if you can't. Were you only able to hear when |

| | |
|---|---|
| 1 | STATE of CALIFORNIA    ) |
| 2 | COUNTY of SAN FRANCISCO ) |

I, MARIA ANTONIA TORREANO, DO HEREBY CERTIFY:

That the foregoing is a full, true and correct transcript of the testimony given and proceedings hereinbefore entitled; that it is a full, true and correct transcript of the evidence offered and received, acts and statements of the court, also all objections of counsel and all matters to which the same relate; that I reported the same in stenotype to the best of my ability, being the duly-appointed, qualified and official stenographic reporter of said court, and thereafter had the same transcribed by computer-aided transcription, as herein appears.

DATE: March 13, 2017

Maria A. Torreano, CSR, CRR, RMR, CCRR
Certificate No. 8600