EXHIBIT E

**JOHN L. BURRIS, ESQ., SBN 69888**
LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, CA 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
Email:  John.Burris@johnburrislaw.com

**ADANTE POINTER, ESQ., SBN 236229**
**PATRICK BUELNA, ESQ., SBN 317043**
POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
Wells Fargo Center
1901 Harrison St., Suite 1140,
Oakland, CA 94612
Tel: 510-929-5400
Email: APointer@LawyersFTP.com
Email: PBuelna@LawyersFTP.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CLEO MOORE, et al. | CASE NO.:  3:18-cv-00634-SI |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY ADJUDICATION** |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants. | HON. SUSAN ILLSTON |
| | Date:      Dec. 4, 2020 |
| | Time:      10 a.m. |
| | Ctrm:      1, 17th Fl (Zoom) |

**PLEASE TAKE NOTICE** that on December 4, 2020 at 10:00 a.m., or as soon as this matter may be heard in front of the Honorable Judge Susan Illston, in the United State District Court, Northern District, San Francisco Courthouse, Courtroom 1, Floor 17, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will move for partial summary adjudication against the Defendants to establish that officers were unlawfully on Plaintiff's porch and not in performance of their duties, and used excessive force as a matter of law pursuant to Federal Rules of Civil Procedure, Rule 56.

## TABLE OF CONTENTS

Table of Contents .................................................................................................... ii

Table of Authorities ............................................................................................... iii

I. Introduction ........................................................................................................ 1

II. Procedural History ............................................................................................ 1

III. Statement of Facts ........................................................................................... 2

    A. Patino's Interaction with ▉Redacted▉ ............................................................. 2

    B. Cha's Interaction with Moore without Patino.................................................. 3

    C. Defendants Refused to Leave Moore's Property After Learning That
He Denied Any Allegations That He Violated the Restraining Order................................. 3

    D. Defendants Re-Entered Moore's Stairs After Not Having Any
Further Legal Basis to Enter the Property and Learning They Were Not Welcome.......................... 4

    E. Defendants' Statements to Homicide................................................................ 7

    F. Body Camera Video of the Shooting................................................................ 8

    G. Defendants' Training…………….................................................................. 9

IV. Argument.......................................................................................................... 10

    A. Legal Standard............................................................................................. 10

    B. Defendants Were Not in Lawful Performance of Their Duties…………….…..…... 11

    C. Defendants Made an Unlawful Seizure As a Matter of Law………….…………..…. 15

        1. Unlawful Seizure Analysis. ……………………………………………........ 15

        2. The Government's Intrusion Was Significant. ……………………………….…….. 16

        3. The Government's Interest ……………………………………………….…..… 17

            a.   Immediacy of the Threat ………………………………………..…..…. 17

            b.   Severity of the Crime…………………………………..…….….….… 18

            c.   Actively Resisting or Evading Arrest…………………………..…..….… 18

        4.   Balancing the Factors ………………………………..….……………..….… 18

    D. Defendant Cha Was Negligent………………………………………..….…… 20

V. Conclusion ……..……………………………………………….......................... 21

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)…..…………….…..………....………10

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)...…..……………………...….……….…10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)……………….……10

*Scott v. Harris,* 550 U.S. 372, 380 (2007)…..…………..……….……………...…….……..…11

*Florida v. Jardines*, 569 U.S. 1, 6 (2013) ..……………... .……………... ...……………..…11

*Silverman v. United States*, 365 U.S. 505, 511 (1961). ..……………... .…………..…...............11

*Oliver v. U.S.*, 466 U.S. 170, at 182, n. 12 (1984). ..……………... .…………………... ...………11

*Payton v. New York*, (1980) 445 U.S. 573...……………... .……………….…... .……………...11

*Welsh v. Wisconsin* 466 U.S. 740, 741–742 (1984) ..……………... .……………….…... ..………11

*U.S. v. Struckman* (9th Cir. 2010) 603 F.3d 731...……………... .……………….…... ...………12

*United States v. Jerez* (7th Cir. 1997) 108 F.3d 684...……………….…... .……………….…...13

*U.S. v. Cormier* (9th Cir. 2000) 220 F.3d 1103...……………….…... .……………….…..13

*City of Houston, Tex. v. Hill*, 482 U.S. 451, at 461 (1987) ..……………….…... ....…14

*Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, at 1378 (9th Cir. 1990) ..…………….............14, 19

*Brendlin v. California,* 551 U.S. 249, at 254 (2007) ..……………... .……………….…...15

*Tennessee v. Garner*, 471 U.S. 1, 8 (1985) ..……………….…... .……………….…......15

*Graham v. Connor,* 490 U.S. 386, 397 (1989) ..……………... .……………….…... ..…………16

*Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). ..……………….…...16, 18

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010) ..……………........ ..……16

*Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003) ..……………... .……………….….16

*Young v. County of Los Angeles*, 655 F.3d 1156, at 1161 (9th Cir. 2011) ..……………….............16

*Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir.2005) ..……………….…... .……………....17

*United States v. Mohr*, 318 F.3d 613, 623 (4th dCir.2003) ..……………….…... .……………….17

*Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185 (9th Cir.2000) ..……………17

*United States v. Neill*, 166 F.3d 943, 949–50 (9th Cir.1999) ..……………….…... .……………….17

*George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) ..……………….…... .……………….…17-18

*Bryan MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) ..……………….…... .……………….............17

*Vos v. City of Newport Beach*, 892 F.3d 1024, 1033 (9th Cir. 2018) ..……………….…... .………17

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001) ..…………….......18

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

iv

*Young v. Cnty. of L.A.*, 655 F.3d 1156, 1165–66 (9th Cir.2011) ..……………... ..………………18

*Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001) ..……………... ..………………...............18

*Cavanaugh v. Wood Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010) ..……………... ..………19

*Azevedo v. City of Fresno,* 2011 U.S. Dist. LEXIS 10132, 31-31 (E.D. Cal. 2011) ..……………19

*Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 628-29 (2013) ..……………... ..………………......20

*Young Han v. City of Folsom*, 695 F. App'x 197, 198-99 (9th Cir. 2017) ..……………... ..……...20

*Grudt v. City of Los Angeles*, 86 Cal. Rptr. 465, 468 (1970) ..……………... ..………………......20

**State Cases**

*People v. Moore*, 2018 WL 2016792 at *1 (1st Dist. 2018)… …………………………………………1

*People v. Lujano* (2014) 229 Cal.App.4th 175..……………... ..……………... ..………………12

*People v. Rivera* (2007) 41 Cal.4th 304..……………... ..……………... ..…...12

*People v. Welsch* (1984) 151 Cal.App.3d 1038..……………... ..……………... ..………………13

*Cassinos v. Union Oil Co*. 14 Cal. App. 4th 1770, 1780 (1993) ..……………... ..………………14

*In re Chase C.* (2015) 243 Cal.App.4th 107..……………... ..……………... ..………………14

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

# I.  INTRODUCTION

Defendants San Francisco Officers Patino and Cha trespassed on Decedent Moore's property, cussed, laughed and provoked him, despite Moore's obvious symptoms of schizophrenia. At 4 A.M. in the morning, Defendants interrogated Moore at his home and refused to leave after he asked them to leave repeatedly and after they no longer had any legal basis to be on his property. Nevertheless, Defendants pepper sprayed Moore, struck him with a baton, and ultimately shot him twice in the stomach, then lied about what happened to homicide investigators. Tellingly, before Defendant Cha even summoned an ambulance to the scene, he called for his police union representative.

Sadly, Decedent Moore would die three years later of complications from the gunshot wounds. Plaintiffs bring this motion on behalf of their son. As a California State Court of Appeals has court already affirmed, Defendants were not lawfully in performance of their duties at the time at the time of their encounter with Decedent Moore. Furthermore, the Defendants were harassing Decedent Moore and unlawfully seized him as a matter of law.

# II. PROCEDURAL HISTORY

On January 6, 2017, Defendant San Francisco Police Department Officers Colin Patino and Kenneth Cha responded to a call that Decedent Sean Moore was banging on a wall he shares with his neighbor in violation of a temporary restraining order. During the encounter, Defendant Cha shot Decedent Moore in the stomach on his front porch.

Decedent Moore was charged with several misdemeanor and felony counts for battery and resisting arrest a police officer.  *People v. Moore*, 2018 WL 2016792 at *1 (1st Dist. 2018) attached as **Exhibit 1** to the Declaration of Patrick Buelna [Buelna Decl.]. After the preliminary hearing, Moore moved to dismiss the charges for insufficient evidence under Cal. Pen. Code § 995. (Id.) The superior court determined there was insufficient evidence that the officers were lawfully performing

their duties when Moore committed the alleged crimes and set aside eight counts. (Id.) The district attorney appealed, but the appellate court affirmed dismissal holding that the Defendants were not in lawful performance of their duties. (Id.)

After the charges were dismissed, Decedent Moore filed his complaint for unlawful seizure and excessive force under the Fourth Amendment (COA 1-2), retaliatory arrest for speech under the First Amendment (COA 3), a *Monell* claim (COA 4), a Bane Act claim for the related civil rights violations in COA 1-3 (COA 5), negligence (COA 6), Title II ADA claim (COA 7), assault and battery (COA 8-9). (Doc. 1).

On January 20, 2020, Decedent Moore died in custody at San Quentin State Prison from complication related to the gunshot wounds he suffered from Defendants' on January 16, 2020. (Doc. 66). Decedent's successors-in-interest, Plaintiffs Cleo and Loyce Moore, substituted into the lawsuit to bring the aforementioned survival claims on his behalf. (Doc. 71).

### III.    STATEMENT OF FACTS

On January 16, 2017, at about 3:50 A.M., Defendants Patino and Cha responded to a call that Decedent Moore was hitting a wall in the middle of the night that his neighbor, Redacted , alleged was in violation of a restraining order. (Admin. Motion to File Under Seal, Buelna Decl., **Ex. 2** – Computer Automated Dispatch [CAD]).

When Defendants arrived at the site of the call, Defendant Cha ascended the Decedent Moore's stairs to make contact and Defendant Patino ascended neighbor Redacted stairs to make contact. (Admin. Motion to File Under Seal, **Ex. 3** – Cha Body Worn Camera [Cha BWC] at 00:00-00:30; **Ex. 4** – Patino Body Worn Camera [Patino BWC] at 00:00-00:30).

### A.  Patino's Interaction with Redacted

Patino ascended ▮Redacted▮ stairs and Mr. ▮Redacted▮ provided him a copy of the restraining order that he had filed on December 20, 2016, for which there was a hearing scheduled (Buelna Decl., **Ex. 2 –** Preliminary Transcript of ▮Redacted▮ Testimony [PX] at pp. 20-21; 24-25). Once ▮Redacted▮ provided Defendant Patino the restraining order, he "started to look at it, but [was] interrupted." (PX 25-26). ▮Redacted▮ explained that he heard loud voices from Mr. Moore's stairwell and Defendant Patino said, "Oh, I got to go help my partner." (Id.) ▮Redacted▮ was not able to provide Defendant Patino any background information about his interactions with Mr. Moore only that Decedent Moore was hitting their shared wall. (Id. at 26-27). Neither Defendant ever asked ▮Redacted▮ to make a citizen's arrest nor ever returned to his door to follow up on his call. (Id. at 30-31).

## B.  Cha's Interaction with Moore without Patino

Defendant Cha ascended Decedent Moore's stairs and rang the door bell. (Cha BWC, 00:00-00:30). There is a front door, a small porch, and then a metal security gate, and Defendant Cha stood outside of the security gate. (Id.) Decedent Moore opened his front door, stepped onto the porch and spoke with Defendant through the security gate. (Id.)

Decedent Moore was upset that police had showed up at his door so early in the morning, and Defendant said they got a call for service. (Id. at 00:30-40). Decedent Moore told Defendant to "get the fuck off my stair", "I didn't call you", and "I just took my garbage out". (Id.. at 00:40-1:00). Defendant Patino arrived seconds afterwards. (Id. at 1:00-1:10).

## C.  Defendants Refused to Leave Mr. Moore's Property After Learning That He Denied Any Allegations That He Violated the Restraining Order

Decedent Moore continued to demand for officers to leave. (Id.). Defendant Patino asked Moore to confirm his identity, which he did. (Id. at 1:10-1:20). Mr. Moore affirmed that he had only put out his garbage and continued to demand officers to get off his property. (Id. at 1:20-1:30).

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

Defendants continued to refuse to leave and Moore continued to insist they leave with colorful language. (Id. at 1:30-2:00).

Moore continued to insist they leave and the Defendants continued to refuse and insisted that they wanted to talk. (Id. at 2:00-2:30). Defendant Patino asked Moore, "So were you violating the restraining order today?" (Id. at 2:30-2:40). Moore replied, "Hell nah." (Id.) Moore told the officers they were not kicking the door in, and Defendant Patino replied, "Not yet." (Id. at 2:40-2:50). Moore also told the officers to leave again. (Id.) Moore continued to assert that he had not violated any restraining order or committed any crimes and told the officers to leave. (Id. at 2:50-3:20). Defendants insisted that they did not have to leave because they were there to conduct an investigation. (Id.)[1]

Moore told officers I am going to call and remove you. (Id. at 3:15-3:35). Defendant Patino lauged and asked, "What is up with this week?'. Defendant Patino said to Defendant Cha, "Let's get out of here before he blasts us with a shotgun" and they descend the stairs. (Id.)

D. **Defendants Re-Entered Decedent Moore's Stairs After Not Having Any Further Legal Basis to Enter the Property and Learning That They Were Not Welcome**

Defendants were on the sidewalk discussing the restraining order's contents, which had already been served (Id. at 1:13-1:16), when Moore reappeared at his door and began cussing at the officers demanding that they leave. (Id. at 3:35-3:55). Defendants reascended the stairs even as Moore told them to leave. (Id. at 3:55-4:10) Defendant Patino "knew who [Moore] so he was under arrest" based on the restraining order. (Admin Mtn for Seal, **Ex. 5** – Patino Statement to Homicide

---

[1] In regards to a restraining order if the victims says the suspect violated and the officers learn from the suspect he denies violating it, they must return to the victim to see what they want the officers to do. (Buelna Decl., **Ex. 3** – Deposition of Person Most Knowledge Regarding Defendant Training Related To Enforcing Restraining Orders [PMK for TRO] at pp. 8; 15; 33). Furthermore, Defendants were trained that when there are conflicting stories, they may not enter the house of the suspect and arrest them because the offense is a misdemeanor that was not committed in their presence. (Id. at 36).

[Patino Homicide], p. 7). Defendants refused to leave and Moore got his telephone and asked for their badge numbers. (Id.) Moore appeared to try to use the phone, meanwhile Defendant Cha updated dispatch that "we are attempting to make contact." (Id. at 4:10-4:20). Defendant Patino asked if Moore was going to listen to him. (Id. at 4:20-4:30).

Defendant Patino continued to try to read the temporary restraining order that already had been served. (Id. at 4:30). Moore said that he heard all of that and he already knew that there was a court date on January 11, 2017. (Id. at 4:30-5:00). Moore yelled for them to get off his stair and that he was through talking with them. (Id. at 5:00-5:30). Defendants said they were not through talking with Moore and told him that they refused to get off of his stairs. (Id.) Moore opened his door and waved his hand telling them to "Get off my stair". (Id.)



(Id. at 5:19)

In response Defendant Cha, who at this point was trespassing, pepper sprayed Moore while he was waving his hand from a distance of 2-3 feet away from the officers and demanding they leave. (Id. at 5:10-5:30; Patino BWC at 4:40 -4:50).[2]



After deploying the pepper-spray, Defendant Cha tried to rush Moore, so Moore kicked him and told them to get off his stairs. (Cha BWC, 5:00-5:30). Defendant Cha backed down the stairs and said, "Fuck you!" (Id.) Moore picked up the copy of the restraining order, and Defendant Patino told him to give it back. (id.)

Defendant Cha yelled at Moore "Motherfucker!", "What's up!" and "Come on!" trying to get Moore to fight, but Moore disengaged and went back inside of his house. (Id. at 5:30-5:50). Defendants went back to the sidewalk. (Id.) Defendant Cha told the radio that Moore made an aggressive movement so they peppered sprayed him. (Id. at 5:50-6:50). Defendant Cha also told dispatch his partner was pepper sprayed and they need medical attention. (Id.)

---

[2] Defendant Cha lied to investigators that Moore tried to attack them, and that's why he pepper sprayed Moore. (Admin Mtn for Seal, **Ex. 6** – Cha Statement to Homicide [Cha Homicide], p. 6). Defendant Patino also lied to investigators and stated that Moore charged at them, which is why Cha pepper-sprayed him. Patino Homicide, 4).

Defendant Patino continued to demand for the restraining order, and Moore responded he would give it back if they would leave. (Id.) Defendants refused. (Id.) Defendant Patino, then, ordered Moore to come outside because he was under arrest. (Id. at 6:50-7:00).

Moore told officers that he could not see and needed medical attention. (Id. at 7:00-8:00). Rather than waiting for back up, Defendants continued to confront Moore, demanded he come out of the house or they would kick the gate open. (Id.) Moore came out and threw the papers through the security gate and onto the stairs. (Id.)

Defendant Cha told Moore to come out so he could get medical attention, while Defendant Patino ascended the stairs to pick up the papers. (Id.) When Moore opened the door, he screamed, "Fuck you!" and Defendant Cha challenged Moore again replying, "Alright, come on! Come on!" (Id.)

Moore told Defendants he would kick their ass, and Defendant Cha said, "Come on!" and "Come out" as both officers took out their batons. (Id.) Moore began walking down the stairs with his telephone in his hand. (Id.)

Defendants began ordering Moore to get on the ground and Moore refused. (Id. at 8:00-8:20). Defendant Cha updated dispatch again saying that Moore was a 6'4",  black male, 275 pounds and had something in his hand. (Id.) Moore descended halfway down the steps and began to pick up one of the papers, while Defendants were on the sidewalk. (Id.)

When Moore bent down to pick up the paper from the stairs, Defendants charged Moore. (Id. at 8:15-20). Moore retreated back up the stairs, but Defendant Patino caught up and began striking Moore on his leg several times with the baton. (Id. at 8:20-25). In response, Moore punched Defendant Patino in the face causing him to lose his balance and tumble down the stairs. (Id.)

**E.  Defendants' Statements to Homicide**

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

Despite the video evidence to the contrary, Defendant Cha lied, again, to the homicide investigators and claimed that Moore was charging towards him while Cha retreated so he shot him:

> "I just see him—I just see this guy just so enraged coming at me in a violent manner, throwing his hand and his feet towards me and, uh, I just remember retreating down the stairs. I was about to fall down and I had nothing else to do but I was in fear for my life and I was in danger of, you know, great bodily injury or death. I don't even know what happened to Colin. And so I shot him. And, uh, when I discharged the firearm there was like—it was like he had hit an invisible wall. Like I was like holy shit, it fucking worked, he's not coming towards me anymore. I remember him saying oh fuck and he ran back in the house and, uh, at that point I just remember laying on the sidewalk on my back." (Cha Homicide, p. 8). Later in his statement he double-downed, stating that "[Moore] was coming down the stairs it was like this big tidal wave."

(Cha Homicide, 17).

Patino also lied to investigators and claimed that Moore "charges at us again a second time" which ultimately resulted in Cha shooting him. (Patino Homicide, 4).

### F. **Body Camera Video of the Shooting**

After Patino tumbled down the stairs, Defendant Cha drew his firearm and charged up the stairs, while Moore simply stood there. (Cha BWC at 8:25-8:30). Moore appeared to kick at him, and Defendant lost his balance and fell backwards. (Id.) Defendant shot Moore twice in the stomach as he fell backwards. (Id.). Defendant Cha fell to the ground on the sidewalk and called out shots fired. (Cha BWC at 8:30-8:40).

Before even summoning the ambulance, Defendant Cha requested, first in order, on the radio for a Police Officers' Association representative. (Id. at 8:40-9:00). When Defendant Patino asked him if he was hit, Defendant Cha said he did not get it but was just "standing [his] ground" – which is also belied by his own body camera footage. (Id.)

Other officers responded and were able to bring Moore into custody without incident and get him into an ambulance. (Buelna Decl., **Ex. 7** – Report) Moore survived the shooting, but scars from

the gunshot wounds ultimately caused his death. (Buelna Decl., **Ex. 4 –** Deposition of Dr. Cohen, pp. 11-12).

### G.  Defendants' Training

Defendants, as all San Francisco Police Officers, were trained that they are not permitted to arrest a person for a misdemeanor committed outside of their presence unless they have some other information. (PMK for TRO, at pp. 8; 15). One such exception is that a citizen lets the officers know they want to make a citizen's arrest but they have to obtain that request from the citizen *first*. (Id. at 16-17). Furthermore, even saying simply "I saw the person commit a misdemeanor" is not sufficient evidence to make a citizen arrest, even this statement needs more information. (Id. at 19).

Defendants were also trained on when and how to arrest a person for violation of a temporary restraining order provided that the victim of the restraing order requests an arrest. (Id. at 24-25). If an officer witnesses the violation they may make an arrest; otherwise, they must conduct an investigation. (Id. at 26). Defendants are also trained that they may only detain someone if they have reasonable suspicion they committed a crime, but once that suspicion dissipates they must let the person leave or continued detention is unlawful. (Id. at 27-28). Defendants were trained in order to make an arrest, they need more than reasonable suspicion – they need probable cause. (Id. at 28-29).

In regards to a restraining order if the victims says the suspect violated its terms and the officers learn from the suspect that he denies violating it, they must return to the victim to see what they want the officers to do. (Id. at 33). Furthermore, Defendants were trained that when there are conflicting stories, they may not enter the house of the suspect and arrest them because the underlying violation is a misdemeanor not committed in their presence. (Id. at 36).

### IV.  ARGUMENT

#### A.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. *Id.*

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence…will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...." *Anderson*, 477 U.S. at 255.

If the non-moving party's version of the facts is ***contradicted by the record to the point that a reasonable jury would not believe it***, the court ***should not adopt the nonmoving party's narrative*** in

ruling on a motion for summary judgment. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (emphasis added).

## B. DEFENDANTS WERE NOT IN LAWFUL PERFORMANCE OF THEIR DUTIES

"[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida v. Jardines*, 569 U.S. 1, 6 (2013) citing *Silverman v. United States*, 365 U.S. 505, 511 (1961).

"This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. We therefore regard the area 'immediately surrounding and associated with the home'— what our cases call the curtilage—as 'part of the home itself for Fourth Amendment purposes.' " *Id.*

While the boundaries of the curtilage are generally "clearly marked," the "conception defining the curtilage" is at any rate familiar enough that it is "easily understood from our daily experience." *Oliver v. U.S.*, 466 U.S. 170, at 182, n. 12 (1984). "The front porch is the classic exemplar of an area adjacent to the home and "to which the activity of home life extends." *Florida*, 569 U.S. at 6.

Ordinarily, government officials may not physically intrude into a home or its curtilage for a search or seizure without the resident's consent unless they have a warrant or exigent circumstances permit warrantless entry. *Payton v. New York*, 445 U.S. 573, 590 (1980); *Welsh v. Wisconsin* 466 U.S. 740, 741–742 (1984). The warrant exception for investigative detentions " 'does not apply to in-home searches and seizures,' " and "to fall within the exigent circumstances exception to the warrant requirement, an arrest or detention within a home...must be supported by both probable cause and the existence of exigent circumstances." *People v. Lujano,* 229 Cal.App.4th 175, 182–183 (2014). While

the " 'exigency' exception" derives from the investigatory function, it allows warrantless entry into a home only if police "have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent...the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " *U.S. v. Struckman,* 603 F.3d 731, 738 (9th Cir. 2010) (italics added).

Here, Defendants entered Plaintiffs' private stairway and ascended the stairs to his front porch to call on him. At the time Defendants ascended the stairway, since they had no warrants, they only had the rights afforded to any passerby to knock and call upon a person at their front door to conduct their investigation. "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " (*Florida*, supra, 569 U.S. at 8) " '[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds.' [Citation.] This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer ) leave." *Ibid.*; see *People v. Rivera,* 41 Cal.4th 304, 308 (2007) ["[e]ven if acting on an anonymous, uncorroborated tip, police may knock on the door of a residence, speak with the occupant, and request permission to enter and search"].)

Once the invitation has been repudiated, the officer must leave absent exigent circumstances or a warrant. A factually analogous case from the federal Seventh Circuit aptly illustrates the point. In *United States v. Jerez* 108 F.3d 684 (7th Cir. 1997) (*Jerez*), officers approached a motel room at about 11:00 p.m. to speak with the occupants despite lacking probable cause or reasonable suspicion they were involved in criminal activity. (*Id*. at pp. 686–687, 693; see *U.S. v. Cormier,* 220 F.3d 1103, 1108–1109 (9th Cir. 2000) [Fourth Amendment protections apply to motel room occupants like residents in their homes].) Officers knocked on the motel room door for several minutes and said,

"Police. Open up the door. We'd like to talk to you." When they received no response, one officer knocked on the motel room's window while another kept knocking on the door. After about two minutes, the officer knocking on the window saw movement in the room and shone a light into the room. An occupant pulled open the drapes and let them in the room after an officer showed his law enforcement insignia and said, "Sheriff's Department. Can we talk to you? Would you open the door?" *Jerez*, at p. 687. The court held the encounter was not consensual. *Id.* at pp. 690–692. "The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop. ... [¶] ... [¶] Simply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer" and " 'convey[ed] a message that compliance with their requests [was] required.' " *Id.* at p. 692.

Similarly, here, Defendants were investigating a possible temporary restraining order violation, which is a misdemeanor. Officers could not arrest Decedent Moore because they may not arrest a person for a misdemeanor violation of a restraining order not committed in their presence. (See Pen. Code § 836 [warrantless arrest permissible when officer "has probable cause to believe that the person to be arrested has committed a public offense in his presence"; *People v. Welsch* (1984) 151 Cal.App.3d 1038, 1042 ["[i]f the officer cannot testify, based on his or her senses, to acts which constitute every material element of the misdemeanor, it cannot be said that the officer has reasonable cause to believe that the misdemeanor was committed in his presence"]).

Moore was not obligated to submit to further questioning within his home, and the officers could not arrest Moore for a misdemeanor violation of a restraining order not committed in their presence. The Officers were no longer lawfully in performance of their duties and were trespassing. It is no defense that the person mistakenly, but in good faith, believed that they had a right to be in that location. *See Cassinos v. Union Oil Co.*, 14 Cal. App. 4th 1770, 1780 (1993).

Although Defendant's may argue that Moore's offensive language and defiance of police authority justified the officers' continued presence in the curtilage of Moore's home or Moore's detention, offensive language does not constitute an arrestable offense. *See In re Chase C.* (2015) 243 Cal.App.4th 107, 115 [" '[s]peech is generally protected by the First Amendment, even if it is intended to interfere with the performance of an officer's duty, provided no physical interference results'"]. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, at 461 (1987). The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. *Id*. at 462–63. "Thus, while police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1378 (9th Cir. 1990), citing *Hill*, supra, 482 U.S. 451.

After Decedent said that he had not violated the restraining order, that he just took out his garbage, and instructed Defendants to get off his property – the Officers were obligated to leave and were no longer within performance of their duties. When they walked down the stairs the first time, there was no question their invitation to knock had been rescinded and they were no longer welcome on the property. Defendants made no further investigation, but re-entered Moore's stairway unlawfully and were trespassing on his property as a matter of law.

## C.  DEFENDANTS MADE AN UNLAWFUL SEIZURE AS A MATTER OF LAW

According to Defendants' own training they knew that they could not arrest or take Plaintiff into custody after he told them he had not violated the civil restraining order, and demanded they leave the premises. Despite Defendant Patino's testimony they could arrest him for the violation

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

based on his self-identification, they did not have probable cause to make an arrest, since the misdemeanor was committed outside of their presence. In order to make an arrest for violation of the civil restraining order, they would have to learn from the neighbor, Redacted, that he wished to make a citizen's arrest. Even then, they were not permitted to enter the house to make that arrest without a warrant.

However, Defendants did not leave, or get a citizen's arrest from Redacted. They re-entered the stairwell and began provoking Decedent Moore and were trespassing unlawfully on his property. Decedent opened the door and waved them off the stairwell standing 2-3 feet away. Defendant used pepper spray on Decedent which was an unreasonable use of excessive force.

### 1.  Unlawful Seizure Analysis

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." *Brendlin v. California,* 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted).

To determine the constitutionality of a seizure, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the government interests alleged to justify the intrusion." *Tennessee v. Garner,* 471 U.S. 1, 8 (1985). In evaluating Fourth Amendment claims, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989). The Ninth Circuit applies a three-step process to determine reasonableness in use-of-force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Glenn v. Washington Cnty*., 673 F.3d 864, 871 (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396).

Third, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty*., 340 F.3d 959, 964 (9th Cir. 2003)).

## 2. The Government's Intrusion Was Significant

Pepper spray is a form of force capable of inflicting significant pain and causing serious injury; as such, it is considered "intermediate force" that, while less severe than deadly force, nonetheless presents a significant intrusion upon an individual's liberty interests. *See Young v. County of Los Angeles*, 655 F.3d 1156, at 1161 (9th Cir. 2011) quoting *Smith v. City of Hemet*, 394 F.3d 689, 701–02 (9th Cir. 2005); *United States v. Mohr*, 318 F.3d 613, 623 (4th Cir. 2003).

Pepper spray "is designed to cause intense pain," and inflicts "a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx," as well as "disorientation, anxiety, and panic." *Young v. County of Los Angeles*, 655 F.3d 1156, at 1162 (9th Cir. 2011) quoting *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199–1200 (9th Cir. 2000), vacated and remanded on other grounds, 534 U.S. 801 (2001); see also *United States v. Neill*, 166 F.3d 943, 949–50 (9th Cir. 1999) (affirming district court finding that pepper spray is a "dangerous weapon" under the U.S. Sentencing Guidelines and describing trial evidence that pepper spray causes "extreme pain" and is "capable of

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

causing 'protracted impairment of a function of a bodily organ' " as well as lifelong health problems such as asthma).

As such, Defendant's use of pepper spray was an intermediate use of force and a significant intrusion on Moore's civil rights.

### 3.  The Government Interest for the Intrusion Under the Totality of the Circumstances

Next, the court must consider the government's interest for the intrusion under the totality of the circumstances. In *Graham*, the Supreme Court noted courts should consider such factors as (a) whether the suspect posed an immediate threat to the safety of the officer or others; (a) the severity of the crime at issue; and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

#### a.  Immediacy of the threat

The Ninth Circuit has repeatedly stated that "the most important of these factors is whether the suspect posed an immediate threat to the safety of the officer or others." *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) quoting *Bryan MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations omitted).

Here, the immediacy of the threat was minimal. Moore was simply waving his hand at officers from 2-3 feet demanding that they stop trespassing on his property. The Officers were not in lawful performance of their duties, and Moore was not threatening them with violence but simply waving them off. Furthermore, Moore was unarmed, outnumbered and on his porch. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1033 (9th Cir. 2018) (finding the suspect not to be a threat when he was surrounded by eight officers some armed with less lethal options, and had the door surrounded and had established defensive cover using police vehicles)

#### b.  Severity of the Crime

The severity of the involved crime was minimal, if not harmless. Defendants were

investigation violation of a *temporary* restraining order and the alleged conduct was banging on a

shared wall, nothing else.

### c.   Actively Resisting or Evading Arrest

Video evidence demonstrated that Defendants were provoking Moore, making fun of him and

cussing at him. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001) (an

officer's "provocative conduct" can trigger an individual's "limited right to offer reasonable

resistance"). Furthermore at the time Defendant Cha pepper sprayed Decedent Moore it is undisputed

that he was not under arrest or evading arrest. All Moore was doing was standing on his porch and

shooing the officers from his porch that were trespassing. See, e.g., *Young v. Cnty. of L.A.*, 655 F.3d

1156, 1165–66 (9th Cir.2011) (arrestee's repeated refusal to reenter vehicle at officer's command is

not active resistance); *Bryan v. MacPherson*, 630 F.3d 805, 829–30 (9th Cir. 2010) (arrestee's cursing

and muttering to himself and exiting his vehicle despite being told to stay in car was not active

resistance).

### 4.   Balancing the Factors

Finally, the court must "balance the gravity of the intrusion on the individual against the

government's need for that intrusion."  *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340

F.3d 959, 964 (9th Cir. 2003)).

In addition to the *Graham* factors, the Ninth Circuit considers the availability of less intrusive

alternatives to the force employed, whether proper warnings were given, and whether it should have

been apparent to officers that the person they used force against was emotionally disturbed, as

additional factors in its analysis.  *See, e.g. Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (2001);

*Cavanaugh v. Wood Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010) (holding the *Graham* factors

did not justify an officer tasering an unarmed woman in the back as she attempted to briskly walk into her house); *Azevedo v. City of Fresno,* 2011 U.S. Dist. LEXIS 10132, 31-31 (E.D. Cal. 2011) (where an officer tasering a man suspected of misdemeanors as he ran full speed on the street could constitute unconstitutional excessive force).

Here, Defendants' need for the intrusion was nearly absent, if not completely absent. They were trespassing on Moore's property and refusing to leave. Moore stepped out and waived his hands. At most, this justified a verbal command or a control hold, but not *intermediate* force since Moore was not under arrest or even detained.

Therefore as a *matter of law* Defendant Cha's use of pepper spray was *unlawful*, excessive force and a violation of Moore's rights under the Fourth Amendment. Therefore Defendant's conduct constituted an unlawful seizure.

Indeed, the Ninth Circuit in *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990) upheld a district court's grant of summary judgment in favor of plaintiffs as to liability of an officer for making an unlawful arrest. In *Duran*, officers were dispatched to a hotel bar for an unruly patron. *Duran*, 904 F. 2d, at 1374. At the bar, plaintiff Duran and the officer Aguilar exchanged heated words, but Duran left the bar. *Id*. Duran's wife drove him home and on their way Duran made an obscene gesture as they passed Aguilar, who noticed it. *Id.* Officer Aguilar followed him home into a mobile home park. *Id*.

Aguilar initiated a traffic stop and ordered Duran to step away from the car. *Id*. Duran told the officer he did not have to and began using profanities. *Id.* at 1374-1375. In response, Officer Aguilar decided to arrest Duran for disorderly conduct and a scuffle ensued causing Duran a dislocated elbow. *Id*. at 1375. The district court granted Plaintiff's motion for partial summary adjudication for an unlawful seizure on the liability issue. *Id*. The Ninth Circuit noted that as "[i]narticulate and crude

as **Duran's** conduct may have been, it represented an expression of disapproval toward a police officer with whom" it was not an arrestable offense and the Court affirmed the unlawful seizure. (*Id.* at 1378).

Similarly here, Moore's profanities were relentless and rude, but the Defendant Officers were trespassing and their videos demonstrate that Moore did nothing criminal during the interaction to justify arrest or force when Defendant Cha used pepper spray.

### D. DEFENDANT CHA WAS NEGLIGENT

Similar to the Fourth Amendment analysis: "[P]ublic employees in California are statutorily liable to the same extent as private persons for injuries caused by their acts or omissions." *Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622, 628-29 (2013). Thus, to support a negligence finding, a plaintiff must show that the defendant public employee had a duty to exercise due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. *Id.* The California Supreme Court "has long recognized that peace officers have a duty to act reasonably when using deadly force." *Id.* at 629. And "[t]he reasonableness of an officer's conduct is determined in light of the totality of the circumstances." *Id.* "In police cases, as well as others, the conduct in question 'must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care such doubt must be resolved as a matter of fact rather than of law." *Young Han v. City of Folsom*, 695 F. App'x 197, 198-99 (9th Cir. 2017) (quoting *Grudt v. City of Los Angeles*, 86 Cal.Rptr. 465, 468 (1970)).

As discussed, Defendant Cha used unreasonable force as a matter of law in seizing Plaintiff and Defendant can only be held liable as a matter of law for his conduct.

## V.    <u>CONCLUSION</u>

Plaintiffs respectfully request this Court GRANT Plaintiff's motion for partial summary adjudication as to the legal issues that Defendants were not in performance of their duties when they re-entered the stairway and used excessive force (and were negligent) as a matter of law when they utilized the pepper spray.


Date: October 30, 2020                         Respectfully submitted,


                                               **POINTER & BUELNA, LLP**

                                               **LAWYERS FOR THE PEOPLE**


                                               <u>/s/ Patrick Buelna</u>
                                               PATRICK M. BUELNA
                                               COUNSEL FOR PLAINTIFFS