# EXHIBIT H

# EXHIBIT 5

|   |   |
|---|---|
| 1 | **PEOPLE V. SEAN MOORE** |
| 2 | **STATEMENT OF OFFICER COLLIN PATINO** |
| 3 | **DATE: 01-07-2017** |
| 4 | **COURT CASE NO.: 17000423**<br>**POLICE INCIDENT REPORT NO.:   170 014 484** |

5  *(Talking begins at around 1:30 of the video. Post-
6  admonition starts at around 3:10 of the video.)*

7       SGT. WATTS:     This is case number 170 014 484. Today's
8  date is the seventh of January 2017. The time is 13:05 hours. I
9  will introduce myself. I'm Sgt. Gary Watts from the Homicide
10 division, Star number 1594. To my right is

11      SGT. DELANEY:   Sgt. Kyra Delaney. Homicide detail, star
12 number 1320.

13      INSPECTOR:      I'm DA Inspector York Ceruto. Star number
14 112.

15      HARRELL:        Scott Burrell here, representing Officer
16 Patino.

17      SGT. WATTS:     Thank you. And your name?

18      OFF. PATINO:    Officer Colin Patino.

19      SGT. WATTS:     C-O-L-I-N?

20      OFF. PATINO:    C-O-L-I-N. Correct. P-A-T-I-N-O. Star 1310.

21      SGT. WATTS:     Date of birth?

22      OFF. PATINO:    Redacted

23      SGT. WATTS:     And date of entry, month and year, into San
24 Francisco PD.

25      OFF. PATINO:    Oh um, September of 2014.

26      SGT. WATTS:     And current assignment?

27      OFF. PATINO:    Taraval Patrol.

28      SGT. WATTS:     Company, alright? (?)

GEORGE
GASCÓN
DISTRICT
ATTORNEY

| | | |
|---|---|---|
| 1 | OFF. PATINO: | Yes, sir. |
| 2 | SGT. WATTS: | And how long is your current assignment? |
| 3 | OFF. PATINO: | Um, for about 4 months I think. |
| 4 | SGT. WATTS: | Any current shift? |
| 5 | OFF. PATINO: | Uh, midnight. |
| 6 | SGT. WATTS: | 2107? |
| 7 | OFF. PATINO: | 2107, correct. |
| 8 | SGT. WATTS: | Uniform? |
| 9 | OFF. PATINO: | Patrol. Yes, sir. |
| 10 | SGT. WATTS: | Ok. |
| 11 | SGT. WATTS: | Um, did you have a partner? |
| 12 | OFF. PATINO: | I did. |
| 13 | SGT. WATTS: | And your partner's name? |
| 14 | OFF. PATINO: | Officer Kenney Cha. |
| 15 | SGT. WATTS: | Do you know the star number? |
| 16 | OFF. PATINO: | 1206. |
| 17 | SGT. WATTS: | And your call sign yesterday? |
| 18 | OFF. PATINO: | 3-Ida-1-6-Edward. |
| 19 | SGT. WATTS: | And the firearm you carry? |
| 20 | OFF. PATINO: | Um Shake 226. 40 cal. Department issued. |
| 21 | SGT. WATTS: | And any secondary firearm carried? |
| 22 | OFF. PATINO: | No. |
| 23 | SGT. WATTS: | Um, the department vehicle last night, |
| 24 | marked or unmarked? | |
| 25 | OFF. PATINO: | It was marked 247. Black and white 247. |
| 26 | SGT. WATTS: | Was it numbered? |
| 27 | OFF. PATINO: | Yes. |
| 28 | SGT. WATTS: | 247. |

GEORGE GASCÓN
DISTRICT ATTORNEY

2

1  SGT. WATTS: And who was the driver? Who was the
2  passenger?
3  OFF. PATINO: I was the driver. Kenney was shotgun.
4  SGT. WATTS: Prior to the incident last night…
5  BURRELL: When do you wanna do the uh—are you going to
6  go into the incident?
7  SGT. WATTS: Uh, yes. Yeah.
8  BURRELL: Because we're going to do the initial
9  statement then go…
10  SGT. WATTS: Yeah, I'm just gonna go—just the general
11  information
12  BURRELL: *Ok.*
13  *SGT. WATTS: With him. And then we're going to ask him to*
14  *read the statement.*
15  BURRELL: Got it, got it.
16  SGT. WATTS: Uh, so about the incident last night. Uh,
17  when did you wake up? How many hours of sleep did you have?
18  OFF. PATINO: Um, I woke up approximately at 6pm. And I
19  went to bed at approximately 7am. So I got a lot of sleep.
20  SGT. WATTS: Do you wear prescription glasses?
21  OFF. PATINO: No.
22  SGT. WATTS: And when did you have your last
23  qualification date at the range.
24  OFF. PATINO: Um sometime in April.
25  SGT. WATTS: Ok.
26  OFF. PATINO: Of 2016.
27  SGT. WATTS: 2016?
28  OFF. PATINO: Yes.

1     SGT. WATTS:    Wait, that's right.

2     SGT. WATTS:    Ok. So um, I'm asking you to provide your
3 initial statement before you review any videos.

4     *At 06:30 Officer Patino removes his cellphone and reads*
5 *from his statement.*

6     OFF. PATINO: Alright. (*Reading*) Early in the morning on
7 January 6, 2017, Officer Kenney Cha and I responded to a call
8 regarding a violation of a restraining order. While attempting
9 to discuss the matter with the suspect, he became irate,
10 aggressive, and violent towards us. During the encounter, the
11 suspect, who was a large man, made numerous threats of violence.
12 At one point he charged at us and Officer Cha pepper sprayed
13 him. He charged at us again a second time engaged in a violent,
14 physical attack. I had to pull my baton in self-defense but that
15 did not stop the suspect. He attacked me by reaching for the
16 baton, assaulted me by punching me in the face, and knocked me
17 down a flight of stairs onto the sidewalk. I then heard at least
18 two gunshots go off.

19     SGT. WATTS:    Okay. Are we good here?

20     SGT. DELANEY:    Yeah.

21     SGT. WATTS:    Okay, so this time we're gonna just move to
22 another room. I'll keep the recording going. And um we're going
23 to review some video. I'll give you time to talk to counsel and
24 then uh we'll come back into the room. We're good?

25     *(Everyone leaves the room at around 7:45 and returns at*
26 *around 33:50 of the video.)*

27     SGT. DELANEY:    Do you have a time?

28     SGT. WATTS:    Yeah, back on 1337. Okay Collin, so you've

GEORGE
GASCÓN
DISTRICT
ATTORNEY

4

1  had a chance to review the video?

2  OFF. PATINO:     Yes, sir.

3  SGT. WATTS:     Okay. So I'm just going to ask you to go
4  through what you saw yesterday, what happened, what you were
5  feeling. Tell us the events from when you got to call to—okay?

6  OFF. PATINO:     So we got the call. Two neighbors—um, I
7  guess one neighbor was violating a Restraining Order. I remember
8  the CAD saying, uh, that the victim lived at, what was it, [Redacted]
9  [Redacted]? And the suspect BMA, six-two, 200-something pounds,
10 lived at 215 I think Capital who was the person violating the
11 Restraining Order.

12 Um, so when we—when we became 97 or at scene, uh, Officer
13 Cha and I my partner we usually do this you know whenever
14 there's a problem between someone it's like hey you go talk to
15 this person, I'll go talk to this person. Cha decided to talk to
16 the possible suspect. I choose to speak to the victim. And no
17 particular reason, that's just what we did that time.

18 So I met with [Redacted] who met me at the doorstep and I
19 asked him what happened. He said that his neighbor Sean who he
20 does have an active Restraining Order against him and he showed
21 me the order of our San Francisco County, said he was violating
22 it by banging on the wall, harassing him at 3:00 in the morning.

23 I took the—and while he was explain to me I heard a loud
24 male voice coming from the area or the direction of my partner
25 Officer Cha. It wasn't—I didn't recognize the voice. It didn't
26 sound like, uh, Officer Cha's voice and I recognized that voice
27 to be loud and it sounded like someone was yelling, upset. So I
28 told [Redacted] hold on, I'll be back. I had the orders in my hand

GEORGE
GASCÓN
DISTRICT
ATTORNEY

5

1 to go see what was going on.

2 I observed when I walked downstairs out to the sidewalk I
3 went to the next house where Kenny was, I walked up the steps
4 and I saw Officer Cha engaging or attempting to engage with a
5 tall—he looked like at least six-two, six-three, maybe six-four,
6 275 plus pound black male behind a gate. This guy was yelling at
7 Kenny. He wasn't even talking to him, he was just yelling him—
8 yelling at him, slamming the gate, cussing at Kenny and Kenny
9 was just saying hey, you know, we're trying to talk to you,
10 we're trying to figure out what's going on.

11 I tried to ask what was going on. I was trying to gather
12 more information. I wanted to make sure that this was indeed our
13 suspect or not. [unintelligible] about safety, took the whole
14 totality of the circumstance. So I had the victim identified and
15 then I had—I see that I asked Sean, I go hey are you Sean? I
16 forget his full name. He goes yeah, I'm Sean. He continued to be
17 more abrasive, threatening manner as in like clenched fist,
18 banging on the gate, threatening us to get off his—his steps or
19 else you know we just told him we wanted to investigate, if he
20 had indeed violated the Restraining Order or not.

21 We attempted to use time and distance. Time by just talking
22 to him, distance because we had a few feet from him. I believe
23 we were a few steps down below from him and we got the gate to
24 create some distance. We weren't trying to deescalate the
25 situation by just, you know, using calm language, talking to
26 him. We weren't yelling him—yelling or giving him orders at that
27 time. We were just trying to figure out the situation.
28 Sean wasn't going with the program. He kept yelling at us,

GEORGE
GASCÓN
DISTRICT
ATTORNEY

6

1  threatening us and then I believe he walked inside and then came
2  back outside. Oh, and at this time because of his mannerisms I
3  saw, I observed Officer Cha had his pepper spray at the low
4  ready just in case because if—because of his mannerisms, his
5  threatening behavior and because of this guy's size that was one
6  of our use of force options at that time. [unintelligible] I
7  wasn't going to go hands-on with him based on the size of this
8  guy. Uh, and so right now we were going to—the next use of force
9  would be O.C.
10    Um, so he opened the gate and kind of while still yelling
11 at us we retreated down below. What happened, what happened? He
12 went inside and then Kenny asked me okay what does the order
13 say? Let's figure this out, okay. So we try to us more time and
14 distance, we go back down the sidewalk. I'm trying to read the—
15 I'm reading the orders to Kenny saying this guy is indeed
16 violating the Restraining Order. He's identified himself at the
17 restraint person and it's already said in the Restraining Order
18 it says shall not, amongst other things, harass, annoy, molest,
19 you know, party one who was [Redacted] which he had already done.
20    So we knew that this guy, uh, he identified himself, we
21 knew who he was so he was under arrest and we wanted him to come
22 out and further the investigation process.
23    And then while I was reading it to Kenny to clarify that
24 the Restraining Order was valid he came out again, opened the
25 gate—or did open the gate, came out, Kenny and I we walked up
26 again to talk to him, try to convince him hey, you know, try to
27 deescalate the situation, talk to him. Hey, we just want you—we
28 want your side of the story basically and all he was going was

GEORGE
GASCÓN
DISTRICT
ATTORNEY

7

telling us fuck you, uh, get off my steps, and I was—I mean I was scared because he's a big dude, he's bigger than me, bigger than Kenny and just his assaultive language. The last thing I wanted to do was get into a fight with this guy because I didn't—I just did not want that, so, you know, which is why we were trying to talk to him, talk him down and he was irate. When he was talking to us—he wasn't even talking to us, he was just yelling at us, spitting at—spitting in our faces, using profanity, using epithets.

Um, and he opens the gate and Kenny goes hey if you come towards us you are going to get sprayed and I so I kind of back away because I don't want to get sprayed and then Sean encroaches on us and at that time I was afraid for my safety and I believe that's when Kenny sprayed him. I saw Sean kind of whimper or like try to get the like get the spray off him and I thought that was a good time to effect the arrest because I saw that there was, that maybe I could, you know, go hands-on because he was already, you know, he'd been O.C.'d and then I walked right into the spray. So my eyes instantly started burning because I know [unintelligible] I'd been pepper sprayed before in the Academy and I just wanted to get as much off as I could so I could continue with this call.

Somehow the—I still had the Restraining Orders in my hand. Those dropped. I don't know how they came out of my hand but they came out of my hand and then I look back and I see Sean with the orders in his hand, the Restraining Orders in his hand, and he walked back in and then I was down on the sidewalk to try to evaluate the situation, try to—and I had let Kenny know hey I

GEORGE GASCÓN
DISTRICT ATTORNEY

8

got hit with the O.C. in my eyes. Um, I was afraid because you know now that my vision is slightly obscured now you know this—this situation had got a little bit more dangerous now so maybe I'm not—so now I'm thinking okay if this guy comes at me I may not have a full—I might not have a great vision because my vision is obscured.

I feared for my safety so I deploy my baton, I take it out just in case if he comes down and makes another more assaultive movements for my safety and for Officer Kenny—uh, Officer Cha's safety.

At that time Officer Cha orders and ambulance per DGO because I got sprayed and because the person, our subject got sprayed and we shall give medical attention. So we weren't just worried about arresting him, we were worried about getting him the medical attention that he needed because he got sprayed. We pleaded with him. We told him hey, you know, hey come out first with the orders okay because they're not yours and also we need to get you medical attention. We pleaded with him. He came out again, opened the gate, threw the orders down. I was still scared because this guys is still yelling at us, still telling us you know get the fuck out of here, threatening us, get off my porch or else, which I took that as a threat. Still fearing for my safety, I still had my baton out just in case I need to protect myself.

And I believe he comes out one more time and says get off my porch. I'm going to kick—and then he literally says I'm going to kick your ass. So, he's a big guy. I was afraid of him because I just don't—I don't want to get hurt. In my mind I'm

GEORGE GASCÓN DISTRICT ATTORNEY

9

thinking I don't want to get hurt, I don't want to piss off my girlfriend because we're supposed to go on a trip. And, uh, I just feel unsafe, right. But I've got—I've got this guy's under arrest so I told him hey you're under arrest, you know, get on the ground or you're going to get batoned and I don't want to baton you [unintelligible] oh my God, I don't want to hurt him. [unintelligible].

And then he comes and I'm repeating, he says you know I'm going to kick your ass. He comes towards us, I believe he's going to attack me and then I see him grab the papers and at that time I believe that was a good time to try to subdue the immediate threat or—yeah, subdue him because maybe, you know, I would be able to arrest him because, I don't know, he's bending down for the order or whatever so I thought that was a good time to go up there and arrest him and if I had to use my baton I did and then I used I don't know how many strikes. At least one strike to zone one. I believe I hit his right leg at least once and I remember striking him and he didn't—he didn't move at all, he just looked at me and then I remember him punching me in the face and I remember falling back. I remember falling back and landed—I don't know, I don't remember if I lost consciousness or not but I, yeah, so then next thing I remember I'm on the ground. Immediately I see a baton, my camera, my flashlight on the ground and then I hear two gunshots go off. I didn't know at the time who shot. So I take out my firearm, I point it in the direction because I don't know if—I don't know if Kenny took the shot or if that guy. Because he was going back in and out of the house. I didn't know what he had. I don't know if he—if he went

1  back in and got a gun and then shot Kenny or whatever. So I
2  pulled my firearm out and I pointed it in the direction of where
3  Sean was and I don't—I don't remember seeing him or not. And
4  then I see Kenny on the ground or on the steps lying down with
5  his firearm up and I ask him hey are you okay, are you okay? Did
6  you get hit? And then I go-then I go on the radio, Code 33,
7  shots fired. And [unintelligible] whatever. Because I still at
8  this point I didn't know if Kenny was shot or not because he was
9  laying on the ground so my initial thought was of fuck my
10 partners fuck just got—[unintelligible]. Like, I didn't know at
11 that time if he'd got shot and then I look at this gun and I see
12 that his hammer is back so I go okay well at least I know he
13 shot once.
14     And then we called for—I don't remember exactly what we
15 called for but I remember [unintelligible] Code 3. And then we
16 just wait it felt like thirty—it felt like thirty minutes. And
17 then I don't remember Sean coming back out or not. And then
18 Kenny was lying there and then I was laying there. I thought
19 [unintelligible] and then Kenny was like hey get behind cover,
20 get behind cover. I am behind cover but I was so, you know,
21 tunnel vision on the stairway because the stairway is like I
22 don't know, maybe big enough for Kenny and I to sit. Definitely
23 not large enough for us to fight in.
24     Uh, and then if I remember, units getting there. Then I got
25 behind cover, behind a car but then Kenny—one of the officers
26 pulled Kenny away and I still didn't know if Kenny was shot or
27 not. And then I feel the effects of O.C. The whole time I was,
28 you know, worried about, fuck I can't see, I've got to fight

GEORGE GASCÓN DISTRICT ATTORNEY

11

1  this guy off. And then, uh, then I got in the ambulance and I
2  made sure Kenny was okay. He told me he wasn't hurt. And there
3  was blood all over the place, I was coughing up blood after I
4  got punched in the face. And I was also—I was sick that day and
5  then. Oh, I thought Kenny got shot because I went over to
6  immediately help him and then I saw blood on him but that was my
7  blood falling on him and, uh, that's all I remember.
8      Then I remember getting treated by the ambulance and so.
9      SGT. WATTS:     Did—did you guys run up the call on the
10 car computer before you—
11     OFF. PATINO:    Yeah, we looked at it on the CAD, yeah.
12     SGT. WATTS:     Have you ever had any prior calls to that
13 10-20, to that residence?
14     OFF. PATINO:    Not that I can recall, no.
15     SGT. WATTS:     Any prior contacts with Sean Moore?
16     OFF. PATINO:    No, not that I remember.
17     SGT. WATTS:     Did you ever see Mr. Moore holding
18 anything in his hands during the contact?
19     OFF. PATINO:    Yes, that I did. I guess he was holding a
20 phone or some dark object one of the times he was coming out of
21 the—in and out of the house.
22     SGT. WATTS:     And who used O.C. again?
23     OFF. PATINO:    Kenny.
24     SGT. WATTS:     Cha?
25     OFF. PATINO:    Cha, yeah.
26     SGT. WATTS:     And what [unintelligible] his use of O.C.
27 was?
28     OFF. PATINO:    Um, for both of our protection because I

GEORGE
GASCÓN
DISTRICT
ATTORNEY

12

1 don't know why he used it, I can't speak for him, but I believe
2 because he was in fear of both of our safety at that time and to
3 you know—for our protection.
4     SGT. WATTS: And when O.C. was used you got a good dose
5 of it yourself?
6     OFF. PATINO: Oh yeah, yeah. It was almost as bad as
7 when I got hit at the Academy. You know, the times one hundred
8 stuff.
9     SGT. WATTS: And from the time you had dosed the O.C.
10 to after the incident ended to when the paramedics arrived you
11 were still feeling the effects of O.C. for the entire time?
12     OFF. PATINO: Absolutely, yeah I was feeling it even
13 when I got home.
14     SGT. WATTS: What training have you had for the use of
15 the Department issued baton?
16     OFF. PATINO: I've had the—the Academy approved
17 training which in the Academy we're allowed to use wood batons
18 and then I took it upon myself when I was—when I got off of T.O.
19 while I was on probation to take the RCB baton course which is
20 an approved method impact weapon by the Department. And I took
21 that class at the Academy.
22     SGT. WATTS: Do you remember when approximately?
23     OFF. PATINO: April or May or 2016.
24     SGT. WATTS: Last year?
25     OFF. PATINO: Yeah.
26     SGT. WATTS: How many times have you had to use the
27 baton and what were the results?
28     OFF. PATINO: Um, approximately one other time I think

GEORGE
GASCÓN
DISTRICT
ATTORNEY

13

1 that was during FTO and that was to subdue a violent subject.
2    SGT. WATTS:    What were the results of that?
3    OFF. PATINO:   Arrest.
4    SGT. WATTS:    Was the use of the baton effective?
5    OFF. PATINO:   Yes. And this is my first time deploying
6 the RCB.
7    SGT. WATTS:    Did you guys request backup at any time
8 during the event?
9    OFF. PATINO:   Yes.
10    SGT. WATTS:    Do you remember what was said over the
11 air?
12    OFF. PATINO:   Um, no I don't remember.
13    SGT. WATTS:    Did you guys request a Supervisor to the
14 scene?
15    OFF. PATINO:   Yes.
16    SGT. WATTS:    At what point did you ask for a
17 Supervisor?
18    OFF. PATINO:   I believe after—I think a Supervisor was,
19 was already in route while the O.C. was sprayed but I remember
20 Kenny asking for a Supervisor after the shots fired.
21    SGT. WATTS:    And do you remember a Supervisor
22 responding to the scene?
23    OFF. PATINO:   Yes.
24    SGT. WATTS:    Who was that?
25    OFF. PATINO:   Oh, Eric—Sergeant Eric Anderson, SGT:
26 Kevin Mannix, the Night Captain Silverman showed up. A slew of
27 Sergeants and Lieutenants.
28    SGT. WATTS:    Was Moore ever responding to your verbal

GEORGE GASCÓN
DISTRICT ATTORNEY

14

1  commands?
2      OFF. PATINO:      Pardon?
3      SGT. WATTS:       Was Moore, Sean Moore, ever responding to
4  your verbal commands?
5      OFF. PATINO:      No.
6      SGT. WATTS:       Did you lose your baton at any point
7  during the confrontation?
8      OFF. PATINO:      Yes.
9      SGT. WATTS:       When was that?
10     OFF. PATINO:      I believe it was after I got hit. I don't
11 remember exactly when.
12     SGT. WATTS:       After you were punched? You were punched,
13 right?
14     OFF. PATINO:      I was punched in the face and then I
15 don't know—
16     SGT. WATTS:       That was my next question.
17     OFF. PATINO:      It was sometime after that.
18     SGT. WATTS:       Did you use your firearm?
19     OFF. PATINO:      No.
20     SGT. WATTS:       But you did draw your firearm?
21     OFF. PATINO:      I did draw my firearm.
22     SGT. WATTS:       And what injuries did you receive?
23     OFF. PATINO:      Broken nose, scrapes to my left knee and
24 the effects of O.C. to both my eyes.
25     SGT. WATTS:       And how is that now?
26     OFF. PATINO:      Oh, better.
27     SGT. WATTS:       Kira?
28     SGT. DELANEY:     I know you watched the video but do you

GEORGE
GASCÓN
DISTRICT
ATTORNEY

1  recall at any time before being punched if you had specifically
2  [unintelligible] I know verbally but was there any other
3  attempts on his part to assault you guys physically?
4      OFF. PATINO:    He showed signs of it, like just a
5  thousand-yard stare that he was giving us, his fists were
6  clenched, smacking on the—smacking on the door. And those were—I
7  mean from what I've learned in the Academy and just through
8  experience you know when people are doing that it's threat
9  indicators and so threat is imminent. This person is planning to
10 attack you, this person does want to hurt you and that's what I
11 honestly believe Moore wanted to hurt Kenny and I. Before being
12 assaulted I mean yeah, I mean walking towards us, you know, in
13 an aggressive manner while looking at us saying I'm going to
14 kick your ass I took that as a threat to my safety and Officer
15 Cha's safety.
16     SGT. DELANEY:    Did prior to going—arriving on scene
17 were you notified of any history involving the address history
18 or any involving his, Mr. Moore's criminal or—
19     OFF. PATINO:    No. From what I remember I'd never heard
20 of Mr. Moore ever. I had zero history with him.
21     BURRELL:    Do you have any recollection if you were
22 punched once, twice, multiple times or if you were kicked or he
23 kicked anybody?
24     OFF. PATINO:    I only remember being punched once in the
25 face.
26     BURRELL:    And you said something I just want to clarify
27 it when you said your baton training you hit to zone one.
28     OFF. PATINO:    Oh, I meant zone two, zone two.

GEORGE
GASCÓN
DISTRICT
ATTORNEY

16

1   BURRELL:   Can you explain what zone one and zone two
2  is?
3   OFF. PATINO:   Number one is up here towards here above
4  the waist and then zone two is below the waist. So I hit him at
5  least once zone two in what I believe was his right leg.
6   BURRELL:   I just had a clarification. At the very
7  beginning of this when you talked about the address I thought
8  you said--and I might have misheard you—but I thought you said
9  the original R.P. was at 521 and then you talked about his
10 weight and then I thought you said the suspect's address I
11 thought you said 215.
12  OFF. PATINO:   I believe the suspect's address was 515,
13 yeah. And then also when I did strike him with the baton I
14 remember him like trying to block it and I don't know if he was
15 trying to grab it or what he was doing but he was definitely
16 attempting to block whatever means I was trying to do to affect
17 his arrest.
18  BURRELL:   And then after you were punched and you fell
19 down, is that a fair statement, you fell down?
20  OFF. PATINO:   I don't know if I flew, I don't know if
21 I—if I walked. I just remember you know the punch forced me to
22 go back.
23  BURRELL:   And you don't know, you don't recall if you
24 blacked out or not but at some point when you are alert on the
25 ground are you sitting, are you laying down on your back or your
26 stomach?
27  OFF. PATINO:   I might have been on my fours, yeah.
28  BURRELL:   And then you also said that you saw your

1  baton and you saw—
2  OFF. PATINO: I saw I don't know if it was mine or—but
3  I saw a baton on the ground, my camera, and my flashlight in the
4  vicinity of where I was at. So like I'm pretty sure I saw all
5  three like when I fully—I don't remember gaining consciousness
6  but I remember being on my fours I believe and then seeing those
7  few items and then I hear at least two shots.
8  BURRELL: Okay. And just to be clear are you and your
9  partner carry the same type of expandable baton?
10 OFF. PATINO: I believe so, yeah.
11 BURRELL: Okay, so that's why you don't know if it's
12 your baton or his baton.
13 OFF. PATINO: Yeah, we both have RCBs.
14 BURRELL: Okay. I think you followed up and—in the
15 first part you said the subject was threatening you to get off
16 the steps or else. Later you said you took that as a threat so
17 when he was making those types of statements it was implied, is
18 that what you mean about his behavior, his demeanor was
19 threatening to you?
20 OFF. PATINO: I took those as threats, yes, against my
21 safety and Kenny's or Officer Cha's safety.
22 SGT. WATTS: Just one more question. You said you
23 didn't remember if you lost consciousness when you fell. Where
24 was it that you wound up? Was it on the steps?
25 OFF. PATINO: It was on the sidewalk.
26 SGT. WATTS: Okay, right. On the sidewalk. That's all.
27 Okay. You want to just give us a moment?
28 **END OF DOCUMENT**

GEORGE
GASCÓN
DISTRICT
ATTORNEY

18